Elsie M. CLAYBURG, Helen M. Jensen and
Elsie M. Clayburg, as Trustee, Appellants,

v.

John Roger WHITT, Harriet Whitt and
Charles L. Hackleman, Appellees.

No. 53546.

Supreme Court of Iowa.

Oct. 14, 1969.

Ray E. Clough, Mason City, for appellants.

Beck, Butler & Pappajohn, Mason City, for John Roger Whitt and Harriet Whitt, appellees.

Westfall, Laird, Burington, Bovard & Heiny, Mason City, for Charles L. Hackleman, appellee.

SNELL, Justice.

This action grows out of sale of the majority of stock in an incorporated grain elevator business. Plaintiff-sellers' action seeks $60,000 plus interest, as unpaid purchase price on a contract to purchase 85 percent of the stock of Farmers Elevator, Inc., an Iowa corporation, and $10,633 for further breach of the purchase contract in failing to relieve plaintiffs of their obligation as guarantor of corporate obligations. Defendants admitted execution of the instrument but pleaded mutual mistake and misrepresentation as to the assets of the corporation. They asserted no contract was, in fact, consummated and counterclaimed for $25,000, plus interest. This represents the amount paid on the purchase price when the contract was executed. The counterclaim states defendants elect to re-

scind the contract on the basis of mutual mistake and misrepresentation.

The case was tried to the court as an equity action. The trial court dismissed plaintiffs' petition and entered judgment totaling $25,000 on the counterclaim. We affirm the dismissal of plaintiffs' claim and reverse the allowance of defendants' claim.

Farmers Elevator, Inc. went into receivership in the summer of 1962 and is now defunct. The question here is who shall bear the loss of practically the entire value of the corporation and the loss suffered by plaintiff Elsie M. Clayburg on an old bank guaranty.

In the summer of 1961, the 1000 shares of stock of Farmers Elevator, Inc., were owned 60 percent by plaintiff Elsie M. Clayburg, 10 percent by Jessie Jensen, Elsie's mother, 15 percent by Helen Jensen, Elsie's sister, and 15 percent by Marion Clayburg, Elsie's husband. Marion Clayburg was president and general manager of the company. Elsie and her mother were on the board of directors but did not take an active part in the business. These people had acquired full ownership of the corporation in 1949.

Elsie Clayburg and her husband, Marion, developed marital difficulties commencing in May 1961 with separation June 1, 1961 and culminating in a divorce on January 2, 1962. In the fall of 1961, coincident with the marital breakup, Elsie, her mother and her sister listed their 85 percent interest in the elevator for sale with Russell Gray, a local broker and realtor. This included the entire interest except for the 15 percent owned by Marion Clayburg.

Elsie acted for herself, her mother and sister. Elsie's authority to so act has not been questioned. She was authorized by oral understanding, power of attorney and assignment.

Mr. Gray had formerly owned part of the elevator and was generally familiar with it. He obtained an unaudited balance sheet which purported to show the company's financial condition as of June 30, 1961.

Defendants, John Roger Whitt, his wife Harriet, and Charles L. Hackleman became interested in purchasing plaintiffs' interest in the business. After some preliminary discussions and negotiations a written contract was signed on December 30, 1961. Among themselves defendants apparently agreed the purchase was to be made 40 percent for the Whitts and 60 percent by Hackleman but this is not reflected in the contract.

The contract provided for sale of the entire 850 shares of stock owned by sellers. Buyers were to pay $25,000 down, $15,000 on January 1, 1963, and a like amount on January 1, 1964, 1965 and 1966. Interest was payable semiannually at $5\frac{1}{2}$ percent. Sellers were to surrender their stock immediately and new shares were to be issued in such names as the buyers should elect. These shares were to be assigned to sellers and held as security until the unpaid purchase obligation was retired. Defendants paid the $25,000 called for on the execution of the contract but failed to pay the first installment on July 1, 1962. On September 8, 1962 a creditor bank commenced action asking that Farmers Elevator, Inc., be put in receivership. On September 8 plaintiffs started this action. Plaintiffs' petition was later amended seeking an additional $10,000 because of Elsie Clayburg's liability under a previously signed guaranty.

Defendants admit the execution of the instrument but claim there was no contract because of misrepresentation or mutual mistake; alternatively, defendants claim they can and do declare the contract rescinded on the same grounds. The trial court, after a long and careful analysis of the necessarily prolix and difficult record, concluded there had been a mutual mistake of fact and rescission should be granted. Our study of the record leads us to the conclusion that neither side is entitled to relief.

I. This case was filed and tried as an equity case and is so argued by both parties in this court. While not denominated as such plaintiffs' claim is actually for

the specific performance of the contract of sale and relief from a guaranty and the transfer of reissued certificates. Accordingly, we treat the matter as in equity and review the case de novo. Davenport Osteopathic Hosp. Ass'n. v. Hospital Service, Inc., 261 Iowa ——, 154 N.W.2d 153, 157. We give weight to the findings of the trial court but are not bound by them. Rule 344 (f) 7, Rules of Civil Procedure. Defendants have asserted grounds for invalidity and rescission. They, therefore, have the burden of proof on such issues. Rule 344 (f) 5, Rules of Civil Procedure.

II. Plaintiffs first assert they carried their burden of proof as to existence of a contract and subsequent breach. The record shows plaintiffs delivered their corporate stock certificates for cancellation but reissued certificates were not delivered to plaintiffs as provided by contract. Plaintiffs resigned as directors and officers of the corporation. The stock was reissued and delivered to Marion Clayburg who was president of the corporation. No assignment by defendants or delivery of the stock to plaintiffs as required by the contract occurred. Execution of the contract for sale of corporate stock and performance by plaintiffs was adequately proved. The trial court's decision does not turn on such considerations but rather on mutual mistake such as to justify invalidation of the contract by rescission.

III. Plaintiffs attack the trial court's finding of mutual mistake and consequent right to rescission. Rescission is an equitable defense to a contract action. Binkholder v. Carpenter, 260 Iowa 1297, 1302, 152 N.W.2d 593.

Plaintiffs first argue the court's disregard of the corporate stock as corpus of the sale was fundamentally wrong. The trial court included in its findings: "The court believes that the defendants were not buying stock, in fact they were buying the elevator. It is true they were only buying 85 percent of the same but they were buying what they thought was a going business."

ness. They did not receive that going business."

Plaintiffs cite Costello v. Sykes, 143 Minn. 109, 172 N.W. 907, 5 A.L.R. 250 for the proposition that where the subject of a sale contract is corporate stock and there is a mutual mistake as to the existence of the underlying assets of the corporation, this mistake cannot be relied upon as grounds for rescission. The case need not be read quite that narrowly. The author of annotation found at 5 A.L.R. 255, states: " * * * the case seems to be decided upon the theory that there can be no rescission of a sale where the means of information are equally open to both parties, each is equally innocent, there is between them no concealment nor imposition, and there is after all a substantial value in the thing sold."

Whatever may be the proper interpretation of the Costello case, we reject the proposition that the existence or non-existence of corporate assets is immaterial. Both buyers and sellers were concerned with the underlying assets and liabilities of this closely held family corporation and they considered the financial structure of the corporation in striking a bargain. In such a situation we adopt the principle recognized in Crocker-Anglo National Bank v. Kuchman, 224 Cal.App.2d 490, 36 Cal.Rptr. 806, 809: " * * * The value of the corporate stock as reflected by the assets of the corporation, its business, its prospects, and its goodwill was certainly a material fact." Cf. Ryan v. Kanne, Iowa, 170 N.W. 2d 395.

Under the circumstances present in this case we hold it was proper for the court to look beyond the form of the asset transferred (corporate stock) to the substance of the transfer (corporate assets and liabilities) in deciding whether there was a mutual mistake such as would justify refusing enforcement or rescission of the contract. Of course, such action does not, of itself, justify complete disregard of the corporate nature of the transaction (purchasers were only acquiring 85 percent of

the stock and corporate management was unaffected). It did justify inquiry as to the existence of corporate assets and liabilities on which a claim of mutual mistake might be predicated.

IV. We will first consider the alleged mistakes on which the trial court's decision was based. The crucial question is whether defendants sustained their burden to show mistake of fact such as would justify rescission. They urge, and the trial court found, mistake of fact in two areas. First, the elevator company had large quantities of government grain in storage; purchasers specifically asked if there was any shortage of grain and were assured by the manager that no such shortage existed; shortages of over 20,000 bushels of corn became apparent within seven months of the purchase; these shortages were apparently the precipitating factor finally resulting in receivership of the corporation. Second, certain assets shown on a June 30, 1961 unaudited balance sheet were the subject of a marital settlement contract which defendants claim substantially reduced the assets of the corporation.

In the fall of 1961 when Mr. Gray undertook to sell plaintiffs' stock in the company he acquired the latest corporate financial statement which had been prepared by a firm of certified public accountants as of June 30, 1961, but which was unaudited in that the existence of assets and liabilities and their values had not been verified. This statement was silent as to any liability in regard to grain shortage. It did show the company was in the grain storage business.

Both Mr. Whitt and Mr. Hackleman were aware of possible loss of grain during storage due to shrinkage, weevils and spoilage. Both asked Marion Clayburg about such a proposition and both were assured there was no shortage. On September 15, 1961 a commodity credit corporation inspector measured the corn and examined the elevator's books. Some shortage was noted. Later inspections by commodity credit corporation and state inspectors indicated shortages in varying amounts. They were not in harmony with each other.

From the record it appears that the measurement of grain in the bins or elevator was not an exact science. Certain arbitrary but not uniform allowances were made for settling, or what is known as "pack"; weight of the particular corn and other factors. These allowances were made in inspections and obviously did not result in a precisely accurate determination of the amount of grain in storage. However, when the government called for delivery there was a substantial shortage. The shortage was borne by the elevator as part of the storage for which it is compensated.

The variation in the art of estimating the amount of acceptable grain in storage resulted in wide variations in the results of several federal and state inspections. Due to the bookkeeping methods of the manager and the difficulties and discrepancies in the measuring of the corn in storage it is impossible to determine the amount of shortage at any one time. However, it is undisputed that there was an ultimate shortage. Shipments in response to shipping orders were short. The government required deposit of $25,000 more guaranty to continue the storage authority. The testimony indicates clearly that the manipulation of the storage records had been going on for some time. Shortages such as developed here do not happen by accident. Shortages in varying amounts had been noted by inspectors beginning in September 1961.

During the six months period from September 1961 to May 1962 the federal government was radically reducing its corn storage. The government had about 450,000 bushels in storage in September 1961. By February 1962 this amount had been reduced to some 250,000 bushels. By May 24, 1962 the government corn in storage was down to 147,000 bushels. An inspection at this time showed a shortage of some 6000 bushels.

When the May 24, 1962 inspection occurred additional discrepancies became apparent. On March 16, 1962 there was an undershipment of 8,429 bushels shown by the records of the elevator. Also, a shortage of 5,189 out of 13,000 bushels of soybeans showed up in this inspection.

V. Another area of mistake was relied on by defendants and the trial court.

As noted, supra, when the property was listed for sale the broker obtained an unaudited balance sheet purporting to show the company's financial condition as of June 30, 1961. This financial statement and the amount of corn in storage turned out to be the substance of the whole situation. The property was listed for sale in the fall of 1961, optioned in November and sold December 30, 1961. Just when the financial statement was first used during the negotiations does not appear but it was neither audited nor current. The record indicates a misplaced reliance on an unaudited financial statement some months old, and statements of a manager (about grain in storage) who was either incompetent or dishonest or both.

That reliance on either was a mistake can hardly be disputed. The statement showed a net worth of $126,122.32, income for the year ending January 30, 1961 of $10,173.88 and the payment of a dividend to shareholders. That something was wrong as to the true value of the corporation is evident. The business went from claimed worth of $126,000 to receivership in about a year. The statement did not take into account any grain shortages. There was evidence (mistakenly relied on by the parties) that the manager assured them that there was no shortage.

VI. Plaintiffs pleaded laches as a bar to defendants' claim. Even where there is clear evidence of mistake the right to rescind may be barred by laches. Although there is nothing in the record to indicate that defendants had reason to suspect the elevator manager it would be an under-statement to say that they exercised caution incident to their purchase.

Defendant-purchasers took over the business on January 1, 1962. The corporation operated for another seven months. It negotiated a $75,000 loan. The bank was ready to loan another $25,000 if the stockholders would guarantee the notes. This had been the bank's position in all financing required by the company. The corporation owned stock in a subsidiary corporation, Fryers Farms, Inc., which was operating when the parent company went into receivership.

After purchase Mr. Clayburg's actions were inadequately supervised by defendants. He sold some 5,000 bushels of soybeans that didn't belong to him or the corporation. He "undershipped" 8,000 bushels of corn in an attempt to balance his corn storage inventory. He increased his employees' account with the corporation by another $8400 so that he owed the company as of June 30, 1962 the sum of $15,076 in one account and $11,813 in another account.

During the seven month period there is little evidence of active participation by the new owners in company business (except for signing the $75,000 note as secretary of the corporation) until June 1962. When it became apparent there was a substantial corn shortage the two new owners went to Chicago with Marion Clayburg to find out what could be done. The Commodity Credit Corporation officials agreed to allow the company to continue its grain storage business if the elevator company would deposit $25,000 as an additional cash bond. The men returned to Mason City and arranged for an additional $25,000 loan to the company. The loan was not made because the new owners refused to guarantee it. Apparently they were beginning to see the light and had had enough. Defendants continued to operate the business until September 1962 when the Iowa Commerce Commission warehouse license was revoked and the corporation was put into receivership.

There is evidence in the record that defendants knew of the estimated 6,000 bushel corn shortage in February and they knew of the increased estimates of a corn shortage in May. During those months, and particularly in June of 1962, an additional $25,000 loan personally guaranteed might have saved the company from receivership. This would have increased the cost of the business by $25,000. Failure to exercise a claimed right of rescission constituted laches such as would bar later exercise of the right.

In Test v. Heaberlin, 254 Iowa 521, 525, 118 N.W.2d 73, 75, we said: "Restatement, Contracts, section 480(1), states, subject to certain exceptions not applicable here: 'The power of any party * * * to avoid a transaction for fraud or misrepresentation is conditional on an offer made promptly after acquiring knowledge of the fraud or misrepresentation to return the amount of any money or other performance received as part of the transaction, in substantially as good condition as when received by him, * * *.'

"Idem, section 484, states, also subject to exceptions not applicable here: 'The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it, or exercises dominion over things restoration of which is a condition of his power of avoidance, * * *.' "

In Gloeser v. Moore, 284 Mich. 106, 278 N.W. 781, 787, the court spoke more directly along essentially the same lines. "To rescind, one must act promptly upon discovery that deception has been practiced upon him [citations]; at least, within a reasonable time. [Citations] What is a reasonable time for rescission by the buyer depends upon the facts and circumstances of the particular case (55 C.J. pp. 287, 288), and is usually a question for the jury. [Citations] A right of action to rescind a contract for fraud or false representations does not accrue until the injured party acquires knowledge of the facts on which the claim for relief may be based. 2 Black on Rescission & Cancellation, § 538, p. 1267. After discovering the facts justifying rescission, the party claiming to have been defrauded is entitled to a reasonable time in which to decide upon the course to be pursued. One who would rescind a contract for fraud must offer to do so promptly on discovering the facts that will justify rescission, and while able himself, or by the judgment of the court, to place the opposite party substantially in status quo. 2 Black on Rescission & Cancellation, § 536, pp. 1264, 1265. Where a purchaser of stock in a corporation delays for several months after discovering he was deceived by false representations as to the amount of dividends it would pay, and obtains an extension of the purchase-money note, and does not offer to rescind until suit is brought he will be held to have waived his right to rescind. 2 Black on Rescission & Cancellation, § 541, p. 1277."

We think the reasoning applies here. As late as June 1962 defendants were in a position to offer to allow plaintiff to reassert her ownership in the corporation. They could not wait until the licenses of the corporation were revoked and the company was in actual receivership and then successfully claim the right to rescind. The record does not support defendants' claim of rescission.

VII. Plaintiff claims defendants' failure to see to her removal as guarantor of the prior corporate obligations occasioned an additional $10,000 loss for which she seeks judgment. Here her argument re laches cuts both ways. The guaranty instrument in question contains the following: "The undersigned may revoke this Guaranty by written notice delivered or mailed by registered mail by the undersigned to the bank, but such revocation shall not affect or release the liability of the undersigned for the then existing indebtedness, or any renewals thereof, theretofore or thereafter made * * *."

Plaintiff failed to take any action to protect herself. Had she taken reasonably prompt action after December 30, 1961, the bank undoubtedly would have insisted on defendants' assumption of these guaranties when the February 1962 $75,000 loan was negotiated. Defendants would have been more cognizant of dangers facing them and plaintiff would have been relieved of liability.

The defense of laches is largely equitable in nature. The age old maxim "He who seeks equity must do equity" is applicable here. Under the circumstances of this case we decline to impose the liability sought.

■ VIII. The equities of this case do not support plaintiffs' prayer for enforcement of the contract and recovery thereunder.

Defendants were careless but had no reason to suspect the manager. His wife, the principal plaintiff here, not only had reason to suspect but did actually suspect and inquire about mismanagement.

Mrs. Clayburg testified that when she sold her stock she did not know the amount of indebtedness from the elevator to the bank. She did not know what the assets or liabilities listed in the statement were. "Marion Clayburg once talked about buying my stock or selling my stock. He said he would like to buy it. I told him no. I didn't think I would ever be paid for it. * * * I never had any knowledge of the quantity of stored corn. * * *

"I thought some money was being taken from the elevator during this period of 1960 or 1961 by Marion Clayburg. I talked to my son, Bill, about it. My son, Bill, told me his father was taking the checks that came back from a bag company where they sent used feed bags. He said something about writing fictitious grain tickets sometimes. Some way the scales are manipulated to weigh an automobile or something presumably empty and full, then write out a ticket for grain that was not

there. I knew about these things when I made this sale in the fall of 1961. * * * I talked to Harley Alitz about it earlier but he was not working there at the time. Harley Alitz had been a former employee of the elevator. He confirmed the facts in this respect to me. * * *

"I testified I was told by other employees that Marion Clayburg then my husband had taken bag checks that came back to the elevator and didn't account for them and had also made some false grain tickets.

"Q. Now did you talk to Marion about that? * * * A. Yes, I did.

"Q. And what did Marion say? * * * A. He said he would stop it.

"Q. Do you have any notion whether he did or didn't stop it? * * * A. I don't know. * * *

"You testified that shortly after New Years in 1960 you discovered from your son, Bill, that your then husband, Marion, had, I think you said misappropriated, theretofore misappropriated some funds belonging to the elevator, is that correct? A. Yes.

"Q. After that what precaution did you take to preclude that happening in the future? A. That (sic) wasn't anything I could do.

"Q. Did you talk with him? A. Yes.

"Q. Did you exact any promises from him? A. He said they had been very negligible and he would stop it.

"Q. Now did you make any effort to determine whether the financial statement of the elevator of June 30, 1961 disclosed these alleged misappropriations? A. No. * * *

"Q. As far as you know these purchasers who bought your stock in December of 1961 didn't know anything about them, the misappropriations? A. No."

Mrs. Clayburg and her husband separated June 1, 1961 and were later divorced.

She first decided to sell her corporate stock in the fall of 1961. Her desire to sell was a perfectly logical and natural conclusion based on the situation. She was separated from her husband, the manager of the business. She had no knowledge as to the accuracy of a financial statement compiled from the records kept by her husband. She had been warned about some of his defalcations and had no confidence in his integrity or managerial ability. She did not claim to know anything about running a grain elevator business. It was a good time for her to get out. In doing so she sold something that was not there. She had less excuse than the defendants to rely on statements as to the condition of the business. She had discussed the matter with her attorney. In any event it appears that there were mistakes of such proportions as to make specific performance inequitable.

IX. The factual situation presents a number of legal problems. They have been exhaustively discussed by sound authorities. Reference to a few will suffice.

As noted, supra, the evidence does not support rescission.

■ Denial of rescission does not require specific performance. While plaintiffs' action for a money judgment is not a demand for specific performance in haec verba it amounts to the same thing. It seeks payment in the promised amounts. In the context of this case such a demand is governed by the same equitable principles as the specific performance plea.

"Rescission is not granted as matter of course on denial of specific performance. Specific performance may be denied though a case for rescission is not made. Dunlop v. Wever [209 Iowa 590] 228 N.W. 562, 565; Bates v. Smith, 48 S.D. 602, (205 N.W. 661); 36 Cyc. 758; 1 Black on Rescission and Cancellation 16." Davis v. Eaton, 211 Iowa 837, 234 N.W. 252.

This rule is as old as 1854. See Brainard v. Holsaple, 4 G.Greene 485.

■ A decree for specific performance of a contract is not granted as a matter of right. It is granted only in the sound discretion of the trial court. Shisler v. Catholic Com. Impr. Assn., 207 Iowa 306, 222 N.W. 838, Pazawich v. Johnson, 241 Iowa 10, 39 N.W.2d 590.

Vermeulen v. Meyer, 238 Iowa 1033, 29 N.W.2d 232, says:

"As heretofore stated, specific performance is not a matter of absolute right and is discretionary with the court. The cases quite generally hold that specific performance must not result in undue hardship and it is the general rule that it will be granted where it appears from the circumstances of the particular case that it subserves the ends of justice; and that on the other hand it will be denied when it appears that it will produce hardship or injustice to either of the parties." (loc. cit. 1043, 29 N.W. 2d loc. cit. 237)

See also Imperial Refineries Corp. v. Morrissey, 254 Iowa 934, 935, 945, 119 N. W.2d 872 and authorities cited therein. University of Des Moines v. Polk County H. & T. Co., 87 Iowa 36, 53 N.W. 1080; Levis v. Hammond, 251 Iowa 567, 100 N.W.2d 638, and Quint-Cities Petroleum Co. v. Mass et ux., 259 Iowa 122, 143 N. W.2d 345.

Specific performance being wholly discretionary various grounds have been used for denial. Among them are:

1. Hardship.

2. Where granting of specific performance would prove harsh, oppressive or unconscionable.

3. Where the consideration for the contract is equitably inadequate, though sufficient as a technical matter at law.

4. Where there was mistake on part of the defendants, though such mistake was not such as to warrant the invalidating of the contract.

5. Where the party seeking to enforce the contract specifically, made innocent

misrepresentations relied upon by defendant, or where the enforcing party was otherwise guilty of inequitable conduct.

Vermeulen v. Meyer, supra, Smith v. Shepherd, 36 Iowa 253.

5A Corbin on Contracts § 1162, page 205 says:

"The court will consider the whole situation and will apply the higher moral standards of existing civilization. Not only must the contract escape being contra bonos mores, it must clearly appear that its terms and its specific enforcement are infra bonos mores. * * *

"There are cases, also holding that facts subsequent to the making of the contract, unforeseen by the parties, affecting values of property or of the consideration given, may be considered, and that specific performance may be refused except upon adjustment of payments in accordance with new facts. The remedy should not be refused, however, merely because of the rise or fall of market values that is within the usual contemplation of contractors and the risk of which is usually intended to be assumed when the contract is made. Specific performance will not be refused merely because the contract turned out to be a losing one." (loc. cit. 207–210)

"Specific performance will not be decreed if there is inequality and hardship in the contract, as against the defendant; or there be good reason to doubt if the defendant entered into it understandingly * * *." Smith v. Shepherd, supra, 36 Iowa loc. cit. 254.

See Nelson v. Robinson, 189 Iowa 1076, 178 N.W. 416 on subsequent change in value. Lucas v. Barrett, 1 G.Greene 510 and Yarcho v. Dawson, 211 Iowa 248, 233 N.W. 21.

In Vermeulen v. Meyer, supra, the following from 49 Am.Jur., Specific Performance, section 55, is quoted with approval:

"While it is a well-established doctrine that equity will not enforce a contract when the plaintiff contributed to or induced the defendant's mistake or misapprehension, the discretion of a court of equity to refuse specific performance of a contract entered into under mistake is not limited to cases in which the mistake was induced or made probable or possible by conduct, acts, or omissions of the plaintiff. Even though the mistake is that of the defendant or his agent and the plaintiff is neither directly nor indirectly responsible therefor, the court may, and ordinarily will, refuse a decree of specific performance where the mistake is a material one and the enforcement of the contract under the circumstances would be inequitable or a hardship to the defendant, particularly where the plaintiff does not claim to have changed his position before he was notified of the mistake or suffered any loss by reason of having entered into the contract. If the mistake was occasioned by the negligence of the defendant but the enforcement of the contract would be inequitable or a great hardship to him, its specific performance will be denied. In such cases, the court is governed by the principle of hardship and unfairness equally with that of mistake. Mistake of the defendant will not be a defense, however, where the plaintiff has altered his position without having acquired knowledge of the defendant's mistake. When mistake is not contributed to or induced by the complainant, the court's refusal to enforce the contract depends in reality upon the existence of elements other than mistake which in and of themselves are usually sufficient to justify the court in refusing to enforce a contract." (238 Iowa loc. cit. 1042, 29 N.W.2d loc. cit. 237)

Thorough review of the multitude of authorities appears in articles by Professor Richard M. Hudson in 7(2) Drake Law Review 3, and 9(2) Drake Law Review 66.

X. In the case before us except to show an amazing lack of prudence the evidence

is unsatisfactory. Several people made many mistakes. The facts are as close as the question is difficult. Should equity decree specific performance? We think not.

No useful purpose would be served by further review here. As cases arise they vary so greatly that only the general principles of equity endure as lasting authority. Here those principles bar recovery by either plaintiffs or defendants.

There is an old saying savored by professors and commentators (frequently critical) on legal decisions "that equity can do anything". Here we apply that statement in reverse and say that equity should do nothing to help any of the parties out of a bad deal. That equity can do anything does not mean that plaintiffs should get everything. Neither plaintiffs nor defendants are on sound ground when they appeal to the conscience of a court of equity for help.

The trial court's disallowance of plaintiffs' claims is affirmed. The allowance of defendants' counterclaim is reversed. The case is remanded with instructions to dismiss both plaintiffs' petition and defendants' counterclaim.

Costs are taxed one-half to plaintiffs and one-half to defendants.

Affirmed in part, reversed in part and remanded.

GARFIELD, C. J., and LARSON, MOORE, BECKER and LeGRAND, JJ., concur.

STUART and RAWLINGS, JJ., dissent.

MASON, J., takes no part.