**SCI MINNESOTA FUNERAL SERVICES, INC., et al.,
Appellants,**

**v.**

**WASHBURN–McREAVY FUNERAL CORPORATION, et al.,
Respondents.**

**No. A09–935.**

Court of Appeals of Minnesota.

March 16, 2010.

---

Patrick R. Martin, Kelly A. Moffitt, Fulbright & Jaworski, L.L.P., Minneapolis, MN, for appellants.

Kevin M. Decker, Jonathan P. Schmidt, Briggs & Morgan, P.A., Minneapolis, MN, for respondents.

Considered and decided by WRIGHT, Presiding Judge; WORKE, Judge; and LARKIN, Judge.

## OPINION

LARKIN, Judge.

Appellants claim that the district court erred by refusing to reform or rescind the parties' agreements concerning the sale of corporate stock, arguing that reformation or rescission is warranted based on the parties' mutual mistake regarding the underlying corporate assets. Because appellants are not entitled to either form of relief, we affirm.

## FACTS

This appeal arises out of the sale of the capital stock of Crystal Lake Cemetery Association (Crystal Lake), a Minnesota corporation. At the time of the sale, appellant SCI Minnesota Funeral Services, Inc. owned all of the issued and outstanding common and preferred stock of Crystal Lake, except for 13.2 shares of preferred stock.[1] Crystal Lake owned and operated three cemetery and funeral-home businesses: Crystal Lake Cemetery/Crematory, Dawn Valley Funeral Home/Memorial Park, and Glen Haven Memorial Gardens. Crystal Lake also owned two vacant parcels of real property: an approximately 8-acre parcel in Burnsville and an approximately 3.6-acre parcel in Lakewood, Colorado.

On July 20, 2005, SCI sold all of its shares of Crystal Lake stock to appellant Corinthian Enterprises, LLC, for one million dollars. The parties intentionally structured the transaction as a stock sale, instead of an asset sale, to allow Crystal Lake to continue operating as a for-profit corporation under Minnesota law.[2] On that same date, Corinthian sold the Crystal Lake stock to respondent Washburn–McReavy Funeral Corporation, pursuant to a share-purchase agreement, for one million dollars. The stock-sale agreement between SCI and Corinthian, and the share-purchase agreement between Corinthian and Washburn, expressly granted SCI the right, prior to closing, to remove from Crystal Lake all assets that were not utilized in or related to the operation of Crystal Lake's cemetery businesses in their present form.

At the time of the transactions, none of the SCI, Corinthian, and Washburn representatives who was involved in the transactions was aware that Crystal Lake owned the Burnsville and Colorado parcels. The

---

1. These 13.2 shares of preferred stock are owned by six shareholders. These shareholders became entitled to receive cash in the sum of $1,926.36 per share as a result of a merger transaction in 1994. But the shareholders could not be located at that time and have not since been located. SCI warrants that these shareholders "are not entitled to receive more than the aforesaid $1,926.36 per share for each such share, if and when any of them may be located and produce their shares for delivery in consummation of the merger transaction."

2. Minn.Stat. § 306.88, subd. 1 (2008), provides that a "lodge, order, or association of a purely religious, charitable, or benevolent description" may acquire a cemetery if, among other requirements, it operates the cemetery as a non-profit.

stock-sale agreement between SCI and Corinthian provides for "[l]egal descriptions of all real property owned or leased by" Crystal Lake, and the descriptions therein do not include the Burnsville and Colorado parcels. Similarly, the share-purchase agreement between Corinthian and Washburn does not mention or legally describe the Burnsville and Colorado parcels. The parties agree that the parcels were not utilized in the operation of the Crystal Lake cemetery and funeral-home businesses and that the value of the two parcels is approximately two million dollars-twice the price paid for the Crystal Lake stock.

In 2008, SCI conducted title searches in connection with a potential sale of the two parcels and discovered that the parcels were titled to Crystal Lake and were therefore transferred to respondents pursuant to the 2005 transactions. SCI contacted respondents and requested quit claim deeds for the parcels. Respondents refused, claiming ownership of the parcels. Appellants sued respondents seeking (1) reformation of the stock-sale agreements to exclude the two parcels from the assets transferred with the stock,[3] (2) rescission of the stock-sale agreements based on mutual mistake or lack of mutual assent, or (3) money damages based on a claim of unjust enrichment.[4] With regard to the reformation claim, appellants requested that the district court reform the agreements so that the parcels are "expressly excluded from the transaction(s) and [are] returned to" SCI. The district court awarded summary judgment in respondents' favor, thereby denying all of appellants' requests for relief. This appeal follows.

## ISSUES

I. Did the district court err by refusing to reform the parties' stock-sale agreements to exclude the Burnsville and Colorado parcels from the corporate assets that automatically transferred to respondents pursuant to the agreements?

II. Did the district court err by refusing to rescind the parties' stock-sale agreements based on lack of mutual assent or mutual mistake?

## ANALYSIS

### I.

■ On appeal from summary judgment, this court must determine "whether there are any genuine issues of material fact and ... whether the [district] court[ ] erred in [its] application of the law." *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). When material facts are not in dispute, we review the district court's application of the law de novo. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310 (Minn.1989). But a district court's determination of a request for reformation on the ground of mutual mistake will be upheld unless it is "manifestly contrary to the evidence." *Golden Valley Shopping Ctr., Inc. v. Super Value Realty, Inc.,* 256 Minn. 324, 329, 98 N.W.2d 55, 58 (1959); *see also Magnuson v. Diekmann,* 689 N.W.2d 272, 274 (Minn.App.2004) (applying this standard in a reformation case on appeal from summary judgment).

■ Appellants argue that we should not apply the manifestly-contrary-to-the-evidence standard of review to the district

---

**3.** SCI and Corinthian stipulated and agreed to the reformation of their stock-sale agreement conditioned upon the reformation of the agreement between Corinthian and Washburn. The second amended complaint states, "Corinthian participates in this action to the extent necessary to ensure that all parties to the relevant Agreements are before the Court."

**4.** Appellants do not raise this issue on appeal.

court's reformation determination because the district court's decision was based on its erroneous conclusion that it lacked authority to grant reformation. Appellants therefore argue that de novo review is appropriate. *See, e.g., Nguyen v. State Farm Mut. Auto. Ins. Co.,* 546 N.W.2d 37, 38 (Minn.App.1996) (reviewing de novo a district court's conclusion that it lacked authority to vacate a judgment), *rev'd on other grounds,* 558 N.W.2d 487 (Minn. 1997).

Appellants' argument regarding the appropriate standard of review is unconvincing. The district court's refusal to grant appellants' request for reformation was not based on a misperceived lack of authority to grant relief. The district court denied relief because it recognized that it could not reform the agreements to exclude the parcels in the absence of evidence satisfying the elements of reformation and because, "[t]he legal requirements for reformation have not been met here." Accordingly, we apply the manifestly-contrary-to-the-evidence standard of review.

 Relief in the form of reformation of a written agreement is available when parties reached an agreement, attempted to reduce it to writing, but failed to express it correctly in the writing. Restatement (Second) of Contracts § 155 (1981). "The province of reformation is to make a writing express the agreement that the parties intended it should." Restatement, *supra,* § 155 cmt. a. "For mutual mistake to justify reformation of an agreement, it must be shown that both parties intended to say something different from what was said in the instrument." 66 Am.Jur.2d *Reformation of Instruments* § 20 (2001).

 A party seeking reformation of a contract on the ground of mutual mistake bears a heavy burden. *Theisen's, Inc. v. Red Owl Stores, Inc.,* 309 Minn. 60, 65, 243 N.W.2d 145, 148 (1976). Before a court of equity will interfere to reform a written

agreement, it must appear that (1) there was a valid agreement sufficiently expressing in terms the real intention of the parties, (2) there was a written contract that failed to express such true intention, and (3) this failure was due to mutual mistake of the parties or unilateral mistake by one party accompanied by fraud or inequitable conduct by the other party. *Id.* at 65–66, 243 N.W.2d at 148. Evidence relied upon to reform a contract because of mutual mistake must be "clear, unequivocal, and convincing." *Golden Valley Shopping Ctr.,* 256 Minn. at 329, 98 N.W.2d at 58.

 Generally, in order to obtain reformation based on mutual mistake, "it is necessary that both parties agree as to the content of the document but that somehow through a scrivener's error the document does not reflect that agreement." *Nichols v. Shelard Nat'l Bank,* 294 N.W.2d 730, 734 (Minn.1980); *see also Premier Bank v. Becker Dev., LLC,* 767 N.W.2d 691, 696–98 (Minn.App.2009); *Johnson v. Johnson,* 379 N.W.2d 215, 218–19 (Minn.App.1985). Proof of the parties' actual intent is fundamental to a claim for reformation. *See Theisen's,* 309 Minn. at 65, 243 N.W.2d at 148 ("Before a court of equity will interfere to reform a written instrument it must appear, substantially as alleged in the pleadings, that there was in fact a valid agreement sufficiently expressing in terms the real intention of the parties . . . ." (quotation omitted)). Reformation of a contract contemplates altering or amending its terms "to reflect the true intent of the parties at the time of its inception." *Jablonski v. Mut. Serv. Cas. Ins. Co.,* 408 N.W.2d 854, 857 (Minn.1987).

 Under these principles and standards, the district court's refusal to grant appellants' request for reformation is not manifestly contrary to the evidence. The district court reasoned that the intent of the parties was to "sell 100% of the

stock of one company to another company." The evidence indicates that the stock-sale agreement between SCI and Corinthian and the share-purchase agreement between Corinthian and Washburn accurately expressed the parties' intent, which was to transfer all of SCI's Crystal Lake stock to respondents. While it is undisputed that none of the parties knew that Crystal Lake owned the Burnsville and Colorado parcels or contemplated that the parcels would be included in the sale, a transfer of all of a company's stock automatically transfers ownership of all of the company's underlying assets and liabilities. *See Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 536 (Minn.1986) ("When a business is sold through a stock transfer, the buyer assumes not only the assets of the corporation, but also the liabilities.").

None of the parties was aware that Crystal Lake owned the Burnsville and Colorado parcels until years after the sale. Thus, there could be no agreement regarding the parcels at the time of the stock sale, and it cannot be said that the parties intended to exclude the parcels from the assets that would automatically transfer pursuant to the stock sale. Because there was never an intention to exclude the parcels, there is no basis to reform the contract to accomplish this result. Accordingly, the district court did not err by refusing to reform the written agreements to include a term expressly excluding the parcels from the corporate assets that would automatically transfer to respondents pursuant to the stock sale.

Appellants concede that they purposely structured the transactions as a stock sale instead of an asset sale and that they understood that all of Crystal Lake's assets and liabilities would transfer pursuant to the stock sale. But appellants argue that we should look past the form of the transactions to the substance and thereby analyze their request for reformation based on the premise that the parties' true intent was to sell the Crystal Lake cemetery and funeral home businesses and only the assets associated with the operation of these businesses—not all of the corporate assets. Essentially, appellants urge us to ignore the fact that the actual subject matter of the sale was the corporate stock. Appellants cite an Iowa case in support of this approach, *Clayburg v. Whitt,* 171 N.W.2d 623 (Iowa 1969). The *Clayburg* court ruled that, when the buyers contracted for the sale of 85% of the outstanding stock in a corporation and considered the underlying assets and liabilities of the corporation and its financial structure in the bargain, "it was proper for the court to look beyond the form of the asset transferred (corporate stock) to the substance of the transfer (corporate assets and liabilities)." 171 N.W.2d at 625–26. The *Clayburg* court refused to apply the holding of our supreme court in *Costello v. Sykes,* 143 Minn. 109, 172 N.W. 907 (1919). *Costello* held that a sale of corporate stock could not be rescinded based on a mistake relating to the attributes, quality, or value of the stock, so long as "the means of information were open alike to both parties, and each was equally innocent, and there was no concealment of facts and no imposition." *Costello,* 143 Minn. at 111, 172 N.W. at 908.

The opinions of foreign jurisdictions are not binding on this court. *Mahowald v. Minn. Gas Co.,* 344 N.W.2d 856, 861 (Minn.1984). We are bound to follow Minnesota Supreme Court precedent. And we are not willing to ignore the stock-sale form of the transactions in this case when the form was so important to the transactions. The parties intentionally structured the transactions as a stock sale to allow Crystal Lake to continue operating as a for-profit corporation under Minnesota law. Appellants were aware of the benefits and the risks associated with

the stock-sale form—including the risks associated with the resulting transfer of all corporate assets. We see no reason to allow appellants to enjoy the benefits associated with the stock-sale structure and yet disregard the structure to the extent that it precludes their request for equitable relief.

Moreover, at oral argument, SCI conceded that it could and should have discovered that the Crystal Lake assets included the Burnsville and Colorado parcels. SCI also conceded that the parties to this transaction are sophisticated businesspeople. The record shows that all parties were advised by counsel. SCI knew that the stock sale would result in the transfer of all of Crystal Lake's assets and had the benefit of written agreements that addressed the risks associated with the automatic transfer of all corporate assets. The stock-sale agreement between SCI and Corinthian, and the share-purchase agreement between Corinthian and Washburn, contain terms that expressly granted SCI the right, prior to closing, to remove from Crystal Lake all assets which were not utilized in or related to the operation of Crystal Lake's cemetery businesses in their present form.[5] SCI conceded that it could have removed the parcels from Crystal Lake prior to closing under these terms. Ignoring the stock-sale form of a contract under these circumstances would excuse the seller from exercising due diligence to identify the corporate assets that will transfer pursuant to the sale. We decline to endorse this approach.

We reject appellants' invitation to look past the form of the stock sale as a means of providing reformation relief to which appellants are not otherwise entitled. The parties intended to transfer all of SCI's stock in Crystal Lake to respondents, and the parties' written agreements accurately expressed this intention. Therefore, the elements of reformation are not satisfied, and the district court's refusal to grant reformation was not manifestly contrary to the weight of the evidence.

## II.

We next address appellants' claim that the district court erred by refusing to rescind the parties' stock-sale agreements. Rescission of a contract is an equitable remedy. *Beck v. Spindler,* 256 Minn. 565, 566, 99 N.W.2d 684, 685 (1959). The granting of equitable relief is within the sound discretion of the district court; only a clear abuse of discretion will result in reversal. *Nadeau v. County of Ramsey,* 277 N.W.2d 520, 524 (Minn.1979). Appellants argue that rescission was appropriate based on the grounds of lack of mutual assent and mutual mistake. We address each argument in turn.

### A. Mutual Assent

While the district court recognized appellants' request for rescission based on lack of mutual assent, the district court did not address the mutual-assent claim. The district court's rescission analysis focused solely on the mutual-mistake theory. "[A]n undecided question is not

---

**5.** We note that these provisions are atypical because a corporation operates in a separate capacity, distinct from its shareholders. *See* 18 C.J.S. *Corporations* §§ 6, 7 (2007) (explaining that "[t]he basic purpose of incorporation is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it em-

ploys," and that "[t]he business of a corporation, and its rights and liabilities, are separate and distinct from those of its shareholders"). And corporate property is held separately from shareholders who do not have a possessory interest in the property. *See* C.J.S., *supra,* § 420 ("Stockholders have neither legal nor, according to some courts, equitable title to the corporation's property.")

usually amenable to appellate review." *Hoyt Inv. Co. v. Bloomington Commerce & Trade Ctr. Assocs.*, 418 N.W.2d 173, 175 (Minn.1988). But on appeal from a judgment, an appellate court may review "any other matter as the interest of justice may require." Minn. R. Civ.App. P. 103.04. Because the facts pertaining to this issue are undisputed and because both parties have briefed the issue, we will address it. *See Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 688 (Minn.1997) (deciding an issue for the first time on appeal that was based on undisputed facts and where neither party was disadvantaged by the lack of an earlier district court ruling on the issue).

▬▬▬▬ When the relevant facts are undisputed, the existence of mutual assent is a legal question that we review de novo. *See TNT Props., Ltd. v. Tri–Star Developers LLC*, 677 N.W.2d 94, 101 (Minn.App. 2004) (applying de novo review to a lack of mutual assent claim). The formation of a sales contract requires the mutual assent of the parties engaging in the transaction. *Hy–Vee Food Stores, Inc. v. Minn. Dep't of Health*, 705 N.W.2d 181, 185 (Minn. 2005). "A contract requires a meeting of the minds concerning its essential elements." *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn.1980).

▬▬▬▬ Appellants argue that because the parties did not have a meeting of the minds regarding the Burnsville and Colorado parcels, there was no mutual assent concerning the sale of the two parcels. This argument ignores the fact that the subject matter of the parties' stock-sale agreements was SCI's stock in Crystal Lake, not the parcels. The parties' stock-sale agreements evidence a meeting of the minds as to the essential terms of the stock sale. Although no party expected or was aware that the two vacant parcels would be transferred as part of the sale,

the parties agreed that all of SCI's Crystal Lake stock would be transferred to respondents and with it ownership of all of Crystal Lake's assets. Because the parcels were Crystal Lake assets, the transfer of the parcels was within the scope of the parties' agreements. Ultimately, there was mutual assent concerning the subject matter of the agreements.

Appellants assert that this case is similar to a Washington case, *W. Coast Airlines, Inc. v. Miner's Aircraft & Engine Serv., Inc.*, 66 Wash.2d 513, 403 P.2d 833 (1965). In *W. Coast Airlines*, plaintiff agreed to sell a quantity of scrap metal, including sealed engine cans, to a scrap-metal dealer. 403 P.2d at 835. "Through some inadvertence, and wholly unknown to either" party, two of the sealed engine cans contained valuable aircraft engines. *Id.* The court determined that there was never mutual assent to sell the engines and, therefore, no contract for their sale existed. *Id.* at 837. Appellants draw an analogy between the Crystal Lake stock and the sealed containers in *W. Coast Airlines* arguing that "[t]he outer vessel in any sales transaction ... does not matter. What matters is whether the parties had any idea concerning what was inside that outer vessel."

Application of the "outer vessel" analysis to a stock-sale transaction is inconsistent with Minnesota Supreme Court's holding in *Costello*. In *Costello*, the parties entered into a contract for the sale of stock in a bank with a mutual understanding of the book value of the stock. 143 Minn. at 110–11, 172 N.W. at 908. Although this mutual understanding turned out to be mistaken, the supreme court held that the buyer was not entitled to rescind his purchase. *Id.* at 114, 172 N.W. at 909. The supreme court recognized that the parties were "mutually mistaken as to the assets of the bank, the actual value and the book

value of its stock, and the amount of its surplus and undivided profits" but determined that this type of mistake did not give rise to a right of rescission. *Id.* at 111, 172 N.W. at 908. The supreme court focused on the subject matter of the transaction—the stock—and reasoned that the buyer "got the shares he intended to buy," and that there was "no mistake as to its identity or existence." *Id.* at 111–12, 172 N.W. at 908. The supreme court concluded: "A mistake relating merely to the attributes, quality, or value of the subject of a sale does not warrant a rescission," so long as "the means of information were open alike to both parties, and each was equally innocent, and there was no concealment of facts and no imposition." *Id.* at 111, 172 N.W. at 908.

While *Costello* did not involve a lack-of-mutual-assent claim, it clearly prohibits an examination of the "contents" of a stock "vessel." The supreme court explained:

If the question were one of first impression, we should not be inclined to open up a new field for litigation by adopting the rule that a contract for the sale of corporate stock may be rescinded merely because both parties were mistaken about the nature or extent of the assets or liabilities of the corporation, if the means of information are open alike to both and there is no concealment of facts or imposition.

*Id.* at 113–14, 172 N.W. at 909.

The undisputed facts of this case show that appellants agreed to sell and respondents agreed to purchase all of SCI's Crystal Lake stock. Under *Costello,* this is where our mutual-assent analysis must end. We will not look past the subject matter of the sale—the Crystal Lake stock—and consider whether there was a meeting of the minds regarding the nature or extent of the assets underlying the stock. There was mutual assent to the transfer of all Crystal Lake assets—known

or unknown, including the two parcels—pursuant to the stock sale.

### B. Mutual Mistake

Appellants also argue that the district court erred by refusing to rescind the parties' agreements based on mutual mistake.

Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake. . . .

Restatement, *supra,* § 152(1).

The district court denied appellants' claim for rescission on the ground of mutual mistake, relying on *Costello. Costello* is directly on point. The parties to the stock sale in *Costello* were "mutually mistaken as to the assets of the bank." 143 Minn. at 111, 172 N.W. at 908. As a result of the mistake, the parties did not know that the shares of stock in the bank were only worth $60 each instead of the $136 purchase price. *Id.* at 112, 172 N.W. at 908. Yet because the purchaser received the "shares he intended to buy," rescission was not warranted. *Id.* at 112–14, 172 N.W. at 908–09. Similarly, appellants sold the shares it intended to sell—all of SCI's Crystal Lake stock. The means of information regarding the nature or extent of Crystal Lake's assets was open to appellants, particularly SCI, and there was no concealment of fact or inequitable conduct by respondents. Thus, the parties' mutual mistake regarding the nature or extent of Crystal Lake's assets is not grounds for rescission. *See id.; Beasley v. Medin,* 479 N.W.2d 95, 98 (Minn.App.1992) (citing *Costello* and holding that a mutual mistake concerning the value of corporate stock does not warrant rescission of a stock pur-

chase when the buyers had not made a reasonable inquiry into the financial condition of the corporation).

Here again, appellants urge us to disregard *Costello* based on the Iowa Supreme Court's rejection of *Costello* in *Clayburg*. See *Clayburg*, 171 N.W.2d at 626 (holding that "it was proper for the court to look beyond the form of the asset transferred (corporate stock) to the substance of the transfer (corporate assets and liabilities) in deciding whether there was a mutual mistake such as would justify ... rescission of the contract"). But *Costello* is binding authority on this matter, and we refuse to apply an Iowa Supreme Court decision instead. *See State v. Ward*, 580 N.W.2d 67, 74 (Minn.App.1998) (stating that this court, as an intermediate appellate court, is "not in [a] position to overturn established supreme court precedent").

Appellants also attempt, unpersuasively, to distinguish *Costello* by arguing that this case "is not about the 'attributes, quality, or value' of the Crystal Lake stock," because the unknown existence of corporate assets valued at two million dollars "has nothing to do with share value." We reject this contention; the relationship between a corporation's assets and its stock value is obvious. Finally, appellants again argue that the parties were fundamentally mistaken as to the "subject matter of the contract itself," maintaining that the Crystal Lake cemetery and funeral home businesses were the subject matter of the contract. Appellants contend that the parties' "[a]greements and documents cry out 'asset sale.'" But in reality, the parties agreed to a stock sale, not an asset sale. The subject matter of the contracts was the Crystal Lake stock, not Crystal Lake's cemetery and funeral home businesses. And for the reasons discussed above, we are unwilling to ignore the form of the stock-sale agreements.

The district court did not abuse its discretion by denying appellants' claim for rescission based on mutual mistake. Having rejected each of appellants' claims, we affirm the district court's award of summary judgment to respondents.

## DECISION

Appellants have forcefully argued that denial of their requests for equitable relief results in a two-million-dollar windfall to respondents and that respondents would be in the position that they had expected if the parcels were returned to SCI. But as argued with equal force by respondents, we are bound to follow the law despite the magnitude of the financial consequence. Because appellants failed to show, by clear and convincing evidence, that the parties intended to exclude the Burnsville and Colorado parcels from the Crystal Lake assets that would automatically transfer pursuant to the stock sale, the district court did not err by denying appellants' request for reformation. Because the stock-sale agreements demonstrated the parties' mutual assent to the transfer of all of SCI's Crystal Lake stock to respondents, appellants are not entitled to rescission based on lack of mutual assent. Finally, because *Costello* governs this case and precludes rescission of the parties' stock-sales agreements based on their mutual mistake regarding the extent of Crystal Lake's assets, the district court did not err by denying appellants' request for rescission on the ground of mutual mistake.

**Affirmed.**

WORKE, Judge (dissenting).

While I agree with the majority's conclusion as to the appropriate standard of review and that rescission on the ground of lack of mutual assent is unavailable here, I respectfully disagree with the conclusion

that appellants are not entitled to reformation.

The first element appellants must show, by clear and convincing evidence, is a valid agreement expressing the real intention of the parties. *Theisen's,* 309 Minn. at 65, 243 N.W.2d at 148. The record contains clear and convincing evidence that when the parties contracted for the sale of Crystal Lake, they intended to transfer only the three cemeteries owned and operated by Crystal Lake. As the district court found, the parties agreed to transfer the three cemeteries, but desired to do so in a manner that avoided implicating Minn. Stat. § 306.88, subd. 1. It was for this reason that the parties agreed to execute this transfer through the sale of stock. The stock sale agreements included a detailed list of the assets that the parties intended to transfer in the sale of the business, including equipment, furniture, and fixtures, but contained no mention of the two vacant parcels. While the agreements purported to include legal descriptions of all real property owned by the business, they listed only the three cemeteries. Because the representatives negotiating for the parties were unaware that Crystal Lake owned the additional two vacant parcels, the value of the vacant parcels was not accounted for in the price of the business. Indeed, the vacant parcels were worth twice what respondent paid for the business integrating three cemeteries.

Both the district court and the majority note that there was no provision in any of the agreements excluding the two parcels from the sale of Crystal Lake. But it is impossible to discern, from this fact alone, whether the parties specifically intended to exclude the parcels from the sale because the parties were admittedly unaware that the parcels even existed. It is apparent that SCI attempted to avoid the unintended transfer of assets in the sale: SCI specifically itemized the assets it intended to sell as part of Crystal Lake, and also included a provision in the agreements allowing SCI to remove assets that it did not intend to sell. The absence of any specific intent to exclude the parcels does not evidence intent to include them.

Appellants must also show that the written agreement failed to express the parties' intent because of a mutual mistake. *Id.* at 66, 243 N.W.2d at 148. The district court erroneously concluded that there was no mutual mistake on the ground that "[t]he mistake was one made solely by SCI." SCI's failure to discover that the two parcels were titled to Crystal Lake's business was undoubtedly unilateral. But the word "mistake" does not refer "as it is sometimes used in common speech, ... to an improvident act." Restatement (Second) of Contracts § 151 cmt. a (1981). Rather, "mistake" refers to an erroneous belief, *id.,* and mutual mistake exists when both parties share an erroneous belief relating to the facts. *Winter v. Skoglund,* 404 N.W.2d 786, 793 (Minn.1987). Here it is undisputed that both parties believed that the extent of the real property owned by Crystal Lake was limited to the three cemeteries. Because of this mutual mistake, the parties did not express their true intent when they reduced their agreement to transfer the three cemeteries into writing in the stock sale agreements.

SCI concedes that it was at fault for failing to discover that the Crystal Lake business owned the two vacant parcels. And one would reasonably suspect that sophisticated businesspeople, aided by counsel and arranging the sale of a business, would conduct a more thorough investigation than an average seller. But "[a] mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation ... unless his fault

amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Restatement (Second) of Contracts, § 157 (1981). If this was not the case, the availability of relief on the ground of mutual mistake would be "severely circumscribed," because a party to a contract could often avoid a mistake by the exercise of reasonable care. *Id.* cmt. a; *see also Gartner v. Eikill,* 319 N.W.2d 397, 399 (Minn.1982) (stating that the "failure of a party to investigate ... will not always preclude rescission"). In *Fritz v. Fritz,* the supreme court opined that reformation should be available only to those "who have not by their own conduct (as laches, negligence, or otherwise) put themselves in such a position as to render it unjust to change the situation." 94 Minn. 264, 266, 102 N.W. 705, 706 (1905) (determining that the appellant's willful ignorance precluded reformation). While SCI should have discovered that Crystal Lake owned the two parcels, its error does not render reformation unjust given its attempts to limit the assets transferred in the sale. Reforming the stock sale agreements would impose no injustice upon respondent, who was likewise unaware of the existence of the additional parcels and neither bargained for nor paid for these properties.

The majority relies on *Costello* in holding that because the nature of the Crystal Lake sale was a stock transaction, the parties must bear the risk that all of Crystal Lake's assets and liabilities, known or unknown, would transfer with the business. As the *Clayburg* court recognized, a distinction should be made between the sale of corporate stock and the sale of a closely-held corporation, even though the latter transaction necessarily involves the sale of stock. 171 N.W.2d at 626. *Costello,* in which the appellant bought ten shares of a bank's outstanding stock exemplifies the former situation, and is therefore not on point. 143 Minn. at 110, 172

N.W. at 908. When the subject of a sale is a small portion of the outstanding stock in a business, the business's assets and liabilities contribute to the book value of the business, and hence the value of the stock. Relief on the ground of mutual mistake is not available when the mistake pertains merely to the value of the item sold. *Gartner,* 319 N.W.2d at 398–99.

But when the business itself is the subject of the sale and, as here, the assets and liabilities are considered in striking the bargain, the business's assets and liabilities go to the very nature of the business. *Clayburg,* 171 N.W.2d at 626–27 (ruling that, even where the purchaser contracted to buy 85 percent of the stock, questions about the existence of corporate assets justified mutual-mistake analysis); *see also Gartner,* 319 N.W.2d at 399–400 (ruling in favor of rescission on the ground of mutual mistake when the mistake "went to the very nature" of the property); *Sherwood v. Walker,* 66 Mich. 568, 33 N.W. 919, 923 (1887) (concluding that the parties' mistaken belief that a cow was barren "went to the very nature of the thing"). I find convincing the *Clayburg* court's ruling that in circumstances where the transaction involves the sale of a corporate business, it is proper to "look beyond the form of the asset transferred (corporate stock) to the substance of the transfer (corporate assets and liabilities)." 171 N.W.2d at 626.

As the *Clayburg* court recognized, looking beyond the form of a stock transaction does not justify "complete disregard of the corporate nature" of the transaction. *Id.* For example, in *Beasley,* this court denied rescission to purchasers of two-thirds of a corporation's stock, in part because the mistake went to the financial condition of the corporation. 479 N.W.2d at 98. This court also found the buyers' reliance on a one-page tax return and the seller's representations unreasonable because they had

an opportunity to question the corporation's accountant and neither requested nor were denied access to the corporation's financial records. *Id.* But if form is always put over substance, any remedy available for mutual mistake would be placed out of the reach of those who would otherwise be entitled to one. A court should not abstain from applying mutual-mistake analysis simply because the underlying transaction was for corporate stock rather than another kind of asset. On the facts of this case, I would reverse and remand to the district court with instructions to grant summary judgment to appellants on the ground that they are entitled to reformation based on mutual mistake.