**SCI MINNESOTA FUNERAL SERVICES, INC., et al.,**
Appellants,

v.

**WASHBURN–McREAVY FUNERAL CORPORATION, et al.,**
Respondents.

No. A09–935.

Supreme Court of Minnesota.

March 30, 2011.

Barbara Jean D'Aquila, Fulbright & Jaworski L.L.P., Minneapolis, MN, for appellants.

Kevin M. Decker, Jonathan P. Schmidt, Briggs and Morgan, P.A., Minneapolis, MN, for respondents.

## OPINION

GILDEA, Chief Justice.

The case arises from a stock sale transaction, and we are asked to decide whether appellants are entitled to reformation or rescission of the transaction because two vacant lots were transferred in the stock sale. Appellant SCI Minnesota Funeral Services, Inc. (SCI) sold Crystal Lake Cemetery Association (Crystal Lake) to appellant Corinthian Enterprises, LLC (Corinthian) in a stock sale agreement. Corinthian subsequently sold and assigned Crystal Lake to respondent Washburn–McReavy Funeral Corporation (Washburn) in a share purchase agreement. SCI and Corinthian brought this action contending the parties did not intend to include the vacant lots in the sale of Crystal Lake, and they sought equitable relief to remedy this claimed mistake. The district court held that SCI and Corinthian were not entitled to reformation or rescission based on mutual mistake, and the court of appeals affirmed. *SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.,* 779 N.W.2d 865, 875 (Minn.App.2010). Because we conclude that neither rescission nor reformation is available, we affirm.

The parties do not dispute the facts that are material to the disposition of this case. In 2005, the parent company of SCI placed several cemeteries and funeral homes on the market. Corinthian purchased some of these cemeteries and funeral homes. Crystal Lake was one of the businesses offered for sale by SCI and purchased by Corinthian. Crystal Lake was comprised of three cemeteries in Minnesota—Crystal Lake Cemetery/Crematory in Minneapolis (Crystal Lake Cemetery), Dawn Valley Funeral Home/Memorial Park in Bloomington (Dawn Valley), and Glen Haven Memorial Gardens in Crystal (Glen Haven).

Although no one involved in the transaction was aware of it, Crystal Lake's assets also included the two vacant lots at issue here. One lot is located in Colorado and one lot is located in Burnsville. SCI either acquired or purchased the vacant lots for Crystal Lake several years prior to the Crystal Lake sale. A former employee of SCI testified that SCI purchased the Colorado land in the late 1990s for tax purposes "as part of a like-kind exchange," and it acquired the Burnsville land when it "had been carved out of the asset sale of another cemetery property years ago." SCI continued to pay property taxes on the Colorado lot after the 2005 sale of Crystal Lake. The parties agree that the value of the two lots is approximately $2 million.

SCI and Corinthian agreed from the beginning of negotiations that they would structure the sale of Crystal Lake as a stock transaction based on their conclusion that Minnesota law prohibits the acquisition of cemeteries for profit.[1] But SCI and Corinthian also agreed that they would classify the sale of Crystal Lake as an asset transaction for tax purposes. The parties agree that the subject matter of the stock sale agreement is the stock of Crystal Lake.

On July 20, 2005, SCI and Corinthian reduced their agreement to writing and entered into a stock sale agreement. In the agreement, SCI agreed to sell all of its shares of Crystal Lake to Corinthian. The purchase price of the stock was $1 million. The stock sale agreement listed the three cemeteries—Crystal Lake Cemetery, Dawn Valley, and Glen Haven—but it did not specifically mention the vacant lots. The agreement did provide, however, for the removal of some of Crystal Lake's assets and operations. The agreement provided that SCI "shall and may cause to be removed" from the Crystal Lake sale all assets owned by Crystal Lake that are "not utilized in or related to the operation of the Business in its present form."

Also on July 20, 2005, Corinthian entered into a share purchase agreement with Washburn in which Corinthian agreed to sell its outstanding shares of stock in Crystal Lake to Washburn for $1 million. In this agreement, Corinthian assigned everything it received from SCI under the stock sale agreement to Washburn. The share purchase agreement listed the three cemeteries—Crystal Lake Cemetery, Dawn Valley, and Glen Haven—as transferring to Washburn.[2]

---

1. Minnesota Statutes § 306.88, subd. 1 (2010), provides in relevant part that "[a] lodge, order, or association of a purely religious, charitable, or benevolent description, may acquire the cemetery property of the cemetery association by gift or purchase and maintain and enlarge it if it ... does not operate for purposes of profit."

2. In the share purchase agreement, Corinthian also assigned any rights it had in the stock purchase agreement to Washburn. As a result and as appellants note in their brief, "Washburn stepped into the shoes of Corinthian as it relates to SCI."

There was no language in either the stock sale agreement or the share purchase agreement that expressly excluded or included the vacant lots from the sale or that limited the sale of Crystal Lake's shares to the three cemeteries owned by Crystal Lake. The parties do not dispute the fact that they intended neither to include nor to exclude the vacant lots from either the stock sale agreement or the share purchase agreement. The parties contend they had no such intention because they did not know about the existence of the vacant lots. But appellants do not dispute that under the terms of the agreements, SCI could have removed the vacant lots from the assets of Crystal Lake prior to the transaction because the lots were not utilized in the operation of the cemetery business.

The record is unclear about when SCI first learned that the Crystal Lake sale included the vacant lots. Washburn first became aware sometime in 2007 or 2008 that it owned the Colorado lot. This occurred when the chief executive officer of Washburn received a phone call from a potential purchaser inquiring about the Colorado property and when Washburn's chief financial officer received a phone call from SCI requesting a quit claim deed for the property. Washburn did not become aware that it was the owner of the Burnsville lot until this lawsuit was commenced.

SCI and Corinthian sued Washburn and requested several forms of equitable relief from the district court, including reformation of both agreements (the stock sale agreement and the share purchase agreement), and rescission. The parties each moved for summary judgment. The district court granted Washburn's motion for summary judgment and denied appellants' motion for summary judgment. The court

held that it could not reform the agreements because the evidence did not satisfy the elements required for reformation. As for rescission, the court considered only the equitable remedy of rescission based on mutual mistake. The court, relying on *Costello v. Sykes*, 143 Minn. 109, 172 N.W. 907 (1919), held that appellants were not entitled to rescission based on mutual mistake because a stock sale transfers all assets and liabilities unless specifically excluded. Because the subject matter of the contract was 100% of SCI's stock in Crystal Lake, the court reasoned that "the parties all knew that a stock transaction would transfer everything that was not specifically excluded," and therefore there was no mutual mistake. Finally, the court dismissed SCI's unjust enrichment claim as a matter of law.[3]

SCI and Corinthian appealed and a divided court of appeals affirmed. *SCI Minn.*, 779 N.W.2d at 875. The court of appeals held that a manifestly-contrary-to-the-evidence standard of review applied to a district court's grant of summary judgment involving reformation. The court of appeals also held that appellants did not satisfy the elements of reformation, and the district court did not abuse its discretion in holding that appellants were not entitled to rescission based on mutual mistake or lack of mutual assent. *Id.* at 870, 872, 875. The dissent agreed with the majority's application of the deferential standards of review and its conclusion that rescission based on lack of mutual assent was not available. *Id.* at 875 (Worke, J., dissenting). But the dissent disagreed with the majority's conclusion that appellants were not entitled to reformation based on mutual mistake. *Id.* at 875–76, 878. We granted appellants' petition for review.

---

**3.** Only SCI sought relief for unjust enrichment. Because SCI did not raise its unjust enrichment claim on appeal, we do not discuss this claim further.

## I.

We turn first to consideration of the proper standard of review that applies to the review of a grant of summary judgment involving claims for equitable relief. Appellants contend that the court of appeals incorrectly applied a manifestly-contrary-to-the-evidence standard to the district court's determination of a request for reformation. Appellants also contend that the court of appeals incorrectly applied an abuse-of-discretion standard to the district court's determination of a request for rescission. Appellants argue that we should apply a de novo standard of review because this case arose from summary judgment in which there were no disputed material facts.

For its part, Washburn argues that we should apply a de novo standard of review in determining whether the elements of reformation have been satisfied. But Washburn contends that the court of appeals correctly applied a deferential standard of review to the district court's decision on equitable claims because we uphold the district court's exercise of equitable powers unless they are manifestly contrary to the evidence, citing *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 353, 205 N.W.2d 121, 124 (1973) (applying a manifestly-contrary-to-the-evidence standard to a reformation decision when a trial court decided the facts) and *Golden Valley Shopping Ctr., Inc. v. Super Valu Realty, Inc.*, 256 Minn. 324, 329, 98 N.W.2d 55, 58 (1959) (same). Washburn also contends that we apply an abuse-of-discretion standard when the district court determines not to rescind a contract. *See Nadeau v. Cnty. of Ramsey*, 277 N.W.2d 520, 523 (Minn.1979) (applying an abuse of discretion standard to a trial court's denial of rescission as an equitable relief after trial). Appellants argue that these cases are inapposite because none of these cases arose in the context of summary judgment.

In *Citizens State Bank v. Raven Trading Partners, Inc.*, we discussed the applicable standard of review when reviewing a grant of summary judgment arising in the equity context. 786 N.W.2d 274, 277 n. 2 (Minn.2010). We concluded that we did not need to decide the proper standard of review in that case because we would reach the same result under a de novo or an abuse-of-discretion standard of review. *Id.* But we also questioned the validity of the application of an abuse-of-discretion standard in the equity context when the appeal is taken from summary judgment. *Id.* We relied on our previous decision in *Medica, Inc. v. Atlantic Mutual Insurance Co.*, 566 N.W.2d 74 (Minn.1997), to illustrate that we have applied a de novo standard of review to a grant of summary judgment to conclude "that equitable subrogation [was] not appropriate under the facts and circumstances." *Id.* at 79, *quoted in Citizens*, 786 N.W.2d at 277 n. 2 (determining whether the district court erred in its application of the law). We emphasized that we applied this standard in *Medica* "[b]ecause the parties [did] not dispute the relevant facts." *Citizens*, 786 N.W.2d at 277 n. 2 (quoting *Medica*, 566 N.W.2d at 76).

As in *Medica*, we also conclude that a de novo standard of review applies to the questions at issue here. A deferential standard of review might be applicable where, after balancing the equities, the district court determines not to award equitable relief. *See, e.g., Dieden v. Schmidt*, 104 Cal.App.4th 645, 128 Cal. Rptr.2d 365, 372 (2002) (explaining that the court applies an abuse of discretion standard when reviewing grants and denials of summary judgment motions based on equitable determinations because equitable determinations are a matter of discretion left to the trial court judge); *Piet-*

*rowski v. Dufrane,* 247 Wis.2d 232, 634 N.W.2d 109, 112 (Wis.Ct.App.2001) ("[W]hen the grant of summary judgment is based on an equitable right, . . . [w]e review the legal issues de novo . . . [, but] the circuit court's decision to grant equitable relief is discretionary and, therefore, will not be overturned absent an erroneous exercise of discretion.").[4] But that is not the situation presented in this case.

▆▆▆ Here, the district court ruled as a matter of law that the requirements for rescission and reformation were not met. We review the court's legal determinations de novo. *See, e.g., Carlson v. Allstate Ins. Co.,* 749 N.W.2d 41, 45 (Minn.2008) (stating that legal questions are reviewed de novo). The court ruled based on undisputed facts and the court's decision was made in response to the parties' cross-motions for summary judgment. We review legal decisions on summary judgment under a de novo standard. *Riverview Muir Doran v. JADT Dev. Group, LLC,* 790 N.W.2d 167, 170 (Minn.2010). That standard of review does not change simply because the claims at issue are for equitable relief. We therefore hold that a de novo standard of review applies to the district court's decision to award summary judgment to Washburn.

## II.

▆▆▆ We turn next to consideration of the district court's conclusion that rescission was not available to appellants in this case. Rescission is an equitable remedy.

See *Nadeau v. Cnty. of Ramsey,* 277 N.W.2d 520, 524 (Minn.1979). In general, "a court may order an agreement rescinded if both parties were mistaken with respect to facts material to the agreement." *Gartner v. Eikill,* 319 N.W.2d 397, 398 (Minn.1982). Appellants argue that rescission is allowed on two grounds—mutual mistake and the absence of mutual assent. We address each argument in turn.

## A.

▆▆▆ Appellants first argue that they are entitled to rescission based on mutual mistake. The district court relied on *Costello v. Sykes,* 143 Minn. 109, 172 N.W. 907 (1919), and held that appellants were not entitled to rescission. Appellants contend that *Costello* does not apply to this case because the subject matter of the agreements was the three cemeteries and not shares of Crystal Lake stock. Specifically, appellants argue that because the parties agreed to treat the stock sale as an asset transaction for tax purposes, this treatment provides evidence that the subject matter of the sale was the cemeteries and not the stock. Appellants also contend that because of the vast difference between what the parties actually transferred—three cemeteries and two vacant lots (valued at $3 million)—and what the parties intended to transfer—three cemeteries (valued at $1 million)—we should not apply *Costello*. Alternatively, appellants contend that we should overturn *Costello*. We agree with the district court

---

4. Not all jurisdictions apply this deferential standard of review when the equitable determination is made on summary judgment. For example, some courts have held that a de novo standard of review applies to equitable determinations made on summary judgment. *See Kennedy Oil v. Lance Oil Gas Co., Inc.,* 126 P.3d 875, 879 (Wyo.2006) ("Although decisions made in equity after a bench trial are reviewed for an abuse of discretion, the same is not true where summary judgment has

been entered; in such cases, our review is *de novo*."); *Johnson v. City of Loma Linda,* 24 Cal.4th 61, 99 Cal.Rptr.2d 316, 5 P.3d 874, 878 (2000) ("Generally, a trial court's laches ruling will be sustained on appeal if there is substantial evidence to support the ruling. Here, the trial court's finding of laches was the basis for its order granting the City's motion for summary judgment [and therefore, de novo review applies].").

that *Costello* controls and we decline to overrule *Costello*.

In *Costello*, the plaintiff purchased 10 shares of stock in the Calhoun State Bank from the defendant shareholders. *Id.* at 110, 172 N.W. at 908. At the time of the purchase, the parties to the transaction believed that the bank was capitalized, that its assets and liabilities were known, and that "the surplus and profits" stated in the books were accurate. *Id.* at 110–11, 172 N.W. at 908. The parties were mistaken in all respects. *Id.* at 111, 172 N.W. at 908. Specifically, the parties to the sale were "mutually mistaken as to the assets of the bank, the actual value and the book value of its stock, and the amount of its surplus and undivided profits." *Id.* at 111, 172 N.W. at 908. The parties were mistaken because employees of the bank, who had misappropriated bank funds, altered the bank's records to conceal their actions. *Id.* at 111, 172 N.W. at 908. Based on the mistakes, the plaintiff sued for rescission of the contract. *Id.* at 111, 172 N.W. at 908.

The question presented in the case was "whether the mistake alleged is of such a character as to give rise to a right to rescind." *Id.* at 111, 172 N.W. at 908. We held that it was not. *Id.* at 111, 172 N.W. at 909. Specifically, we concluded that a sale of corporate stock may not be "rescinded merely because both parties were mistaken about the nature or extent of the assets or liabilities of the corporation" as long as the "means of information are open alike to both and there is no concealment of facts or imposition." *Id.* at 114, 172 N.W. at 909. We reached this conclusion because the subject matter of the contract was the stock of the bank, and the purchaser received the shares of stock that he intended to buy. *Id.* at 111, 172 N.W. at 908. Under these circumstances, where the purchaser's complaint was only about

the value of the shares, and "[i]n the absence of fraud or inequitable conduct," rescission was not an available remedy. *Id.* at 114, 172 N.W. at 909.

*Costello* bars rescission in this case. *Costello*, like this case, involved the sale of stock. The parties' intent, as reflected in their written agreement, was to transfer all of SCI's stock in Crystal Lake to Corinthian and then to Washburn. Even if there was a mistake as to the value of the transaction, as appellants contend, under *Costello* we do not look behind the form of the transaction when the mistake is one of value. As we said in *Costello*, "[a] mistake relating merely to the attributes, quality, or value of the subject of a sale does not warrant rescission." 143 Minn. at 111, 172 N.W. at 908. We hold that under the rule of *Costello*, appellants are not entitled to rescission.

■ If we conclude, as we have, that *Costello* bars the rescission claim, appellants urge us to overrule *Costello*. Based on the principle of stare decisis, "[w]e are 'extremely reluctant to overrule our precedent . . .' and 'require a compelling reason' to do so." *Zutz v. Nelson*, 788 N.W.2d 58, 63 (Minn.2010) (quoting *State v. Martin*, 773 N.W.2d 89, 98 (Minn.2009)). Appellants contend that we should overrule *Costello* because under *Costello*, there could never be rescission in a stock sale transaction. We do not read *Costello* so broadly.

Contrary to appellants' argument, in *Costello* itself, we suggested situations where rescission might be possible even in a stock sale. *See* 143 Minn. at 113–14, 172 N.W. at 908–09. We noted that rescission might be possible when the parties are mistaken about the actual existence or identity of the stock. *Id.* at 113, 172 N.W. at 909. For example, rescission might be available if the parties believe they are selling and purchasing shares of stock in Company X and instead, they are selling

and purchasing shares of Company Y. *See id.* at 113, 172 N.W. at 909. We also noted that courts might grant rescission in the context of the sale of stock when there has been dishonesty by one of the parties. *Id.* at 114, 172 N.W. at 909. *Costello* therefore should not be read to bar rescission in all stock sale transactions, even though it operates to bar rescission in this case.

Appellants also rely on *Clayburg v. Whitt,* 171 N.W.2d 623 (Iowa 1969), a decision from the Iowa Supreme Court, in arguing that we should overrule *Costello.* In *Clayburg,* the court rejected "the proposition that the existence or non-existence of corporate assets is immaterial." 171 N.W.2d at 626. The court reasoned that under the facts of the case, "[b]oth buyers and sellers were concerned with the underlying assets and liabilities of [a] closely held family corporation and they considered the financial structure of the corporation in striking a bargain." *Id.* Given that the corporation's assets and liabilities were material to the agreement, the court held that simply because the transaction was structured as a stock sale should not preclude rescission. *See id.* ("Under the circumstances present in this case we hold it was proper for the court to look beyond the form of the asset transferred (corporate stock) to the substance of the transfer (corporate assets and liabilities) in deciding whether there was a mutual mistake

such as would justify refusing enforcement or rescission of the contract.").

Appellants contend that *Clayburg* supports their argument that we should look beyond the form of the transfer—a stock transaction—and look to the substance of the transfer—three cemeteries—to determine whether appellants are entitled to rescission because the parties considered Crystal Lake's assets and liabilities when negotiating the agreement. The dissent in the court of appeals agreed with the reasoning in *Clayburg.* *SCI Minn.,* 779 N.W.2d at 877 (Worke, J., dissenting).

The *Clayburg* court adopted a rule different from our rule in *Costello* that rescission is not available in the stock sale context when the parties are mistaken about the extent of the assets of the corporation. But the analysis in *Clayburg* does not establish that the reasoning in *Costello* is unsound. *See Zutz,* 788 N.W.2d at 63 (noting "that *stare decisis* 'does not bind [our court] to unsound principles'" (quoting *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 406 (Minn.2000))). *Clayburg* therefore does not provide a basis upon which we should depart from our precedent.[5]

In sum, appellants have not presented any compelling reason for us to depart from our established precedent. Under that precedent, we hold that rescission does not apply in this case.[6]

---

5. In *Cargill Inc. v. Ace Am. Ins. Co.,* 784 N.W.2d 341, 352–54 (Minn.2010), we recently overruled precedent. We did so because we concluded that the precedent at issue was "contrary to principles of equity, [was] at odds with some of our statements in" other cases and did not promote good public policy. *Id.* at 352–53. Appellants have not demonstrated that any of this is true with regard to *Costello.*

6. Rather than rely on *Costello,* appellants urge that we apply the analysis from the Restatement (Second) of Contracts § 152 to assess the rescission claim. *See* Restatement

(Second) of Contracts § 152 (1981) (explaining that "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154"). Outside the stock sale context, we have relied on the Restatement's basic-assumption test in section 152 to examine claims for rescission based on mutual mistake. *See Winter v. Skoglund,* 404 N.W.2d 786, 793 (Minn.1987) (explaining that "[i]f

## B.

As an alternative to their mutual mistake argument, appellants argue that they are entitled to rescission due to a lack of mutual assent. Specifically, appellants contend there was no mutual assent between the parties when forming the stock sale agreement because there was only a "meeting of the minds" to sell, purchase, and transfer the cemeteries and not the vacant lots. The formation of sales contracts requires mutual assent among the parties involved in the transaction. *Hy–Vee Food Stores, Inc. v. Minn. Dep't of Health,* 705 N.W.2d 181, 185 (Minn.2005). Mutual assent entails a "meeting of the minds concerning [a contract's] essential elements." *Minneapolis Cablesystems v. City of Minneapolis,* 299 N.W.2d 121, 122 (Minn.1980); *see also* Black's Law Dictionary 132 (9th ed.2009) (defining mutual assent as an "[a]greement by both parties to a contract . . . in the form of offer and acceptance"). Whether mutual assent exists is tested under an objective standard. *Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.").

When viewed under an objective standard, there was mutual assent to sell the Crystal Lake stock. The stock sale agreement clearly stated that "[SCI] does hereby agree to sell, transfer, assign and deliver . . . all of the issued and outstanding shares of capital stock of [Crystal Lake] which are owned by [SCI]." In the context of a stock sale agreement, the law presumes that all assets and liabilities transfer with the stock. *Cf. Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 536 (Minn.1986) ("When a business is sold through a stock transfer, the buyer assumes not only the assets of the corporation, but also the liabilities."). When the undisputed evidence is examined under an objective standard, it establishes that mutual assent existed to sell the Crystal Lake stock, which included the vacant lots as part of the assets. We therefore hold that appellants are not entitled to rescission for lack of mutual assent.

## III.

We turn next to consideration of appellants' claim for reformation. Reformation is an equitable remedy that is available when a party seeks to alter or amend language in a contract so that the contract reflects the parties' true intent when they entered into the contract. *See Jablonski v. Mutual Serv. Cas. Ins. Co.,* 408 N.W.2d 854, 857 (Minn.1987). The court of appeals applied the rule from *Costello* to bar the reformation claim. *SCI Minn.,* 779 N.W.2d at 871–72. Appellants contend that *Costello* was about rescission and that the case has no application to the reformation claim. Further, appellants argue that even if *Costello* applies, it does not control this case because the subject matter of the stock sale agreement was the

---

there is a mutual mistake concerning a material fact, parties to a contract may avoid the contract"); *Gartner v. Eikill,* 319 N.W.2d 397, 398 (Minn.1982). Even if we were to apply the basic-assumption test of section 152, the rescission claim would still fail. Under section 152, rescission is not available if the party "bears the risk of the mistake." Restatement (Second) of Contracts § 152. As discussed more fully below, because SCI had the opportunity to exclude property that was

not utilized in the operation of Crystal Lakes' cemetery business, SCI bore the risk of any mistake here, and rescission is therefore not appropriate even assuming there had been a mutual mistake for purposes of assessing rescission under section 152. *See* Restatement (Second) Contracts § 154 cmt. B (1981) (stating that a party may "agree, by appropriate language or other manifestations, to perform in spite of mistake that would otherwise justify his avoidance").

cemeteries and not the stock itself. For its part, Washburn contends that *Costello* applies to the reformation claim because "[t]he foundation for both reformation and rescission in this case is the alleged 'mutual mistake.'" Washburn therefore contends that, given our holding in *Costello,* appellants are not entitled to reformation because the subject matter of the stock sale agreement was all of the shares of Crystal Lake stock.

We agree with appellants that *Costello* is not determinative of the reformation claim. While it is true, as Washburn argues, that appellants' reformation and rescission claims are both grounded in mutual mistake, reformation and rescission are different forms of equitable relief. In reformation, a contract is modified to reflect the parties' true intent, whereas in rescission, the entire contract is voidable. *Compare Jablonski,* 408 N.W.2d at 857 ("[R]eformation contemplates alteration or amendment of the policy language to reflect the true intent of the parties at the time of its inception."), *with Beck v. Spindler,* 256 Minn. 565, 566, 99 N.W.2d 684, 686 (1959) ("[A] party seeking rescission of a contract must return, or offer to return, what he has received under it, and thus put the other party as nearly as is possible in his situation before the contract, is the law." (citation omitted) (internal quotation marks omitted)). When the relief seeks to void the entire contract, the additional analysis from *Costello,* which focuses on the form or subject matter of the transaction that the part seeks to undo (i.e., a stock sale), applies. *See Costello,* 143 Minn. at 111, 172 N.W. at 908. But we have never used that additional analysis in the reformation context, where the relief does not seek to unwind the transaction but simply to modify it to reflect the parties' actual intention. We likewise decline to do so here.

Instead, we apply our precedent setting forth the elements a plaintiff must prove to establish a prima facie case of reformation. A party seeking reformation must prove that: "(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party." *Nichols v. Shelard Nat'l Bank,* 294 N.W.2d 730, 734 (Minn.1980). The plaintiff must establish these elements through "evidence which is clear and consistent, unequivocal and convincing." *Id.; see also Leamington Co. v. Nonprofits' Ins. Ass'n,* 615 N.W.2d 349, 354 (Minn. 2000). This is the quantum of proof appellants must demonstrate, and we have characterized this level of proof as a "high" burden. *Leamington,* 615 N.W.2d at 355 n. 4.

We conclude that appellants have not met the requirements for reformation as a matter of law. Even if appellants had satisfied the first element, appellants did not demonstrate that the agreements failed to express the parties' true intentions, the second element, or that any such failure was due to a mutual mistake, the third element.

With respect to the second element, appellants contend that while the parties intended to transfer all of Crystal Lake's assets through the stock sale, the parties made a mutual mistake because the stock sale agreement did not exclude the vacant lots from the transactions, and therefore the agreement did not reflect the parties' true intentions. But the stock sale agreement gave SCI the right to exclude the vacant lots because these lots were not used in the cemetery business. Specifically, the language of the agreement provided

that SCI "shall and may cause to be removed" from the Crystal Lake sale all assets owned by Crystal Lake that are "not utilized in or related to the operation of the Business in its present form." Under this provision, SCI removed certain assets, including computers and computer software, from the transaction. But SCI took no action to remove the vacant lots.

Appellants acknowledge that SCI could have excluded the vacant lots under this provision, but contend the provision is not dispositive because none of the parties was aware of the existence of the vacant lots. But under Minnesota law, when a business sells and transfers all of its stock, it is selling *all* of its assets and liabilities unless the business has expressed otherwise. *Cf. Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 536 (Minn.1986) ("When a business is sold through the transfer of assets, the assets alone pass to the buyer. When a business is sold through a stock transfer, the buyer assumes not only the assets of the corporation, but also the liabilities. This greater risk justifies greater protection for the stock purchaser."). Because SCI had the right to exclude the vacant lots under the plain terms of the stock sale agreement, as a matter of law appellants cannot prove that the agreement did not reflect the parties' true intention.

With respect to the third element necessary for reformation, appellants' claim also fails as a matter of law. The undisputed facts establish that appellants have not proven that the stock sale agreement failed to express the parties' true intentions because of a mutual mistake. Any mistake here regarding the vacant lots was SCI's mistake alone because it was SCI that failed to remove the lots from the transaction.

Appellants argue that SCI could not remove the lots because it was un-aware of their existence. But under general corporate law principles, "a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent ... acquires knowledge while acting in the course of employment within the scope of his or her authority." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 895–96 (Minn.2006) (quoting 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 790 (2002)) (internal quotation marks omitted); *see also Brooks Upholstering Co. v. Aetna Ins. Co.*, 276 Minn. 257, 262, 149 N.W.2d 502, 506 (1967) ("[I]f the officer or agent was one who was acting within the scope of his duties, his knowledge is imputable to the corporation."). Consequently, even though those who negotiated the deal for SCI may not have known about the vacant lots, those employees at SCI who purchased the vacant lots and paid the property taxes on them were aware of SCI's ownership (through its ownership of the Crystal Lake stock) of the vacant lots. There is no evidence in the record or any contention that the employees who purchased the vacant lots and paid the property taxes on the land were acting outside the scope of their employment when engaging in these activities. Accordingly, their knowledge is imputed to SCI generally.

Because someone at SCI was aware of the existence of the vacant lots, and Minnesota law imputes this knowledge to the entire company, *see Travelers*, 718 N.W.2d at 895–96, SCI could have removed the vacant lots from the sale. SCI failed to do so, and therefore, any mistake was a unilateral mistake. A court cannot reform a contract based on a unilateral mistake unless there was some evidence of fraud or inequitable conduct. *Nichols*, 294

N.W.2d at 734. The district court did not find either type of conduct, and the parties do not challenge that conclusion. On this record, we hold that appellants have not met the third element necessary for reformation.

In sum, the undisputed evidence establishes that appellants cannot prove that the stock sale agreement failed to express the true intentions of the parties because of a mutual mistake. We therefore hold that appellants are not entitled to reformation.

Affirmed.