*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1568**

Christopher C. Mogren,
Appellant,

vs.

Gregory Johnson,
Respondent.

**Filed July 18, 2016
Affirmed
Smith, Tracy M., Judge**

Washington County District Court
File No. 82-CV-14-4105

Daniel M. Gallatin, Gallatin Law, PLLC, Hugo, Minnesota; and Erica Holzer, David F. Herr, Maslon LLP, Minneapolis, Minnesota; and Michael D. O'Neill, Martin & Squires, P.A., St. Paul, Minnesota (for appellant)

Lisa Lamm Bachman, Tessa A. Mansfield, Kyle A. Eidsness, Foley & Mansfield, PLLP, Minneapolis, Minnesota; and Daryl Bergmann, Business Legal Services, Bloomington, Minnesota (for respondent)

Considered and decided by Reilly, Presiding Judge; Smith, Tracy M., Judge; and Klaphake, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH, TRACY M.**, Judge

In this appeal following a bench trial, appellant Christopher C. Mogren challenges the district court's refusal to enforce a written settlement agreement between Mogren and his former business associate, respondent Gregory Johnson, and the district court's determination that Mogren converted $50,000 of Johnson's money. By notice of related appeal, Johnson challenges the district court's determination that he is not entitled to indemnification from Mogren for his attorney fees in this action. Because the record supports the district court's conclusions that the parties rescinded the settlement agreement, that Mogren converted $50,000 of Johnson's money, and that Johnson is not entitled to indemnification, we affirm.

## FACTS

Johnson invented technology for hands-free shoe lacing after watching his mother struggle with arthritis. He obtained several patents on his designs and founded Palidium, Inc., in December 2005 to market and sell his shoe-lacing products.[1]

Johnson and Mogren were business acquaintances. They discussed the shoe-lacing technology and at one point discussed becoming partners in Palidium, but nothing came of the discussions. Eventually, Mogren began representing that he was a co-inventor of the Palidium technology, which Johnson denies. Mogren also sought to become employed by Palidium.

---

[1] The company was originally called "Palidum, Inc.," but the name was changed. We use its ultimate name throughout this opinion.

*Subscription agreement*

In October 2010, Mogren and Palidium entered into a subscription agreement, with Johnson signing as Palidium's President. The subscription agreement was drafted by Palidium's counsel, a private corporate lawyer. Under the subscription agreement, Mogren invested $100,000 in exchange for 102,041 shares of Palidium stock. In the agreement, Mogren acknowledged that his stock purchase created no right to employment with Palidium and that "the company would not have issued securities to [him] if [he] had any contrary expectations." Mogren also agreed to disclose to Palidium any inventions or intellectual property relating to Palidium and to assign to Palidium any interest in such inventions or intellectual property. Finally, Mogren agreed

> to indemnify and hold the Company and its governors, managers, affiliates, agents and employees harmless from and against any and all loss, claim, damage, liability or expense, and any action in respect thereof, arising out of a breach of any such representation, warranty or covenant, together with all reasonable costs and expenses (including attorneys' fees) incurred by the Company or any such person in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters so indemnified against.

The subscription agreement remains in effect.

*Disputes between the parties*

Disputes arose between the parties over the next several years. After signing the subscription agreement, Mogren attempted to solicit investors for Palidium, and he continued to claim he was an inventor of the technology and represented that he was an officer or representative of Palidium. Johnson testified that he had originally intended to

3

give Mogren a percentage of any investments Mogren secured but learned he could not do that because Mogren was not a broker. Palidium sent Mogren a cease-and-desist letter, stating that pursuant to the subscription agreement Mogren is a shareholder only and asking Mogren to "immediately cease any further activities in the name of or on behalf of Palidium, Inc." Palidium eventually sent Mogren two more cease-and-desist letters after he did not immediately cease his activities.

Mogren also sought to become a Palidium licensee and threatened to take legal action if his request was denied. Palidium repeatedly denied Mogren's request to become a licensee. Around this same time, Mogren's divorce proceeding with his ex-wife was reopened due to Mogren's failure to disclose the value of his Palidium shares.

*Settlement agreement*

On August 14, 2013, Mogren, Johnson, and Palidium entered into a confidential settlement agreement. This settlement agreement was drafted by Palidium's counsel to memorialize an oral agreement between Mogren and Johnson that Mogren would cease claiming credit for Johnson's invention and release his ownership claims to Palidium's patents in exchange for appointment as Palidium's chief executive officer (CEO) and an equalization of shares between Johnson and Mogren. Mogren represented to both Johnson and Palidium's counsel that his marital-property dispute was resolved, with Mogren's ex-wife receiving 51,021 of Mogren's existing shares in Palidium. According to Johnson, Johnson "made a big point that [the dissolution proceeding] had to be done" to ensure that the Palidium stock split was equal and Mogren "assured [him] that was

4

done" and that the "divorce was finalized." Palidium's counsel also "received assurances" from Mogren that the marital-property dispute was settled.

The settlement agreement explained that Mogren held 102,041 shares of Palidium common stock "*provided that*, 51,021 of such shares are being transferred by Mogren to his former spouse incident to a [marital] property settlement agreement as of the Effective Date." Based on Mogren's alleged agreement to transfer 51,021 shares to his ex-wife, Johnson agreed to transfer 2,474,490 of his shares to Mogren to equalize the parties' shares at 2,525,510 each. Palidium's counsel interpreted the settlement agreement to require transfer of 51,021 shares to Mogren's ex-wife on August 14, 2013, the effective date of the settlement agreement. He prepared a stock certificate for this purpose and gave it to Mogren. Palidium's counsel also prepared stock certificates to reflect the new division of shares between Mogren and Johnson. None of the newly drafted stock certificates was executed.

At the same time as the settlement agreement, Mogren and Johnson also entered into a voting agreement and, consistent with the voting agreement, elected themselves to the Palidium board and appointed Mogren as president, chief financial officer, and treasurer, and Johnson as executive vice president, chief technology officer, and secretary.

Shortly after executing the settlement and voting agreements, Johnson and Palidium's counsel learned that Mogren had not reached a property settlement with his ex-wife. The parties became concerned that the shares transferred to Mogren in the settlement agreement could be considered marital assets and that Mogren's ex-wife could

5

receive half of Mogren's new shares. According to Johnson, Mogren "call[ed] [him] in a panic" and stated that the parties needed to "rescind [the settlement agreement] and rip it up." Johnson believed that Mogren used the word "rescind" or "destroy."

Johnson and Mogren visited Palidium's counsel on September 25, 2013 to, according to Johnson, "mutually rescind this agreement." Mogren asked Palidium's counsel to return all executed copies of the settlement agreement. Palidium's counsel understood that Mogren and Johnson "had agreed that the document would be torn up, which was a phrase that was used during that meeting, and that once the marital property settlement was completed, they would come back to [him] with new instructions." Palidium's counsel gave Mogren his original copy of the settlement agreement and all documents in the file that pertained to the agreement.

*Memorandum of understanding*

Later that day, Johnson and Mogren, without counsel, visited a bank and signed a memorandum of understanding and agreement, in which Mogren transferred 2,500,000 shares of Palidium stock to Johnson "for a time period to expire on" December 1, 2013. After December 1, the stock would revert to Mogren. Mogren claimed that the memorandum was prepared by an unnamed employee of Palidium's counsel's firm in response to Mogren's and Johnson's potential tax problems, and denied preparing it himself. But Palidium's counsel denied preparing the memorandum, and Johnson believed that Mogren wrote it. The district court found that Mogren wrote the memorandum of understanding.

Although the memorandum says nothing to this effect, Johnson believed that the purpose of the agreement was to hold half of Johnson's shares in reserve for *purchase* by Mogren on December 1, 2013. Mogren did not purchase the shares on December 1, but in early 2014 he informed Palidium's counsel that the parties had agreed that Mogren would purchase Johnson's shares for $0.10 per share or $250,000. The purchase did not take place. Mogren continued working as Palidium's CEO.

*Stock sale to third party*

Around the same time as the alleged rescission of the settlement agreement in Palidium's counsel's office, Johnson agreed to sell some of his personal shares of stock to a third party for $50,000. Johnson testified that Mogren changed the deal so that Mogren collected $14,000 from the third party and Johnson collected $36,000. Before collecting the money, Johnson told Mogren that he would put the money back in the company if Palidium needed funds for an upcoming shoe purchase. Mogren asked Johnson to "return" the money, and Johnson did. But the money was not deposited into Palidium's account, and Johnson never received any of the $50,000 or any explanation regarding where the money went.

*Marital-property resolution and end of Mogren's employment*

Mogren's marital-property dispute was finally resolved in March 2014 when the district court filed an amended judgment and decree that, in relevant part, gave both Mogren and his ex-wife 51,020.5 shares of Palidium common stock.

On June 6, 2014, Johnson and Mogren visited a bank so that Mogren could access funds to pay Johnson for his half of the stock. Mogren tried but was unable to procure a

7

$250,000 check. That same day, Johnson terminated Mogren "as an officer, director and employee of Palidium, Inc.," and appointed himself as Palidium's CEO and sole board member. Palidium's shareholders later ratified Mogren's dismissal.

*Lawsuit*

Mogren sued Johnson, requesting (1) a declaratory judgment that he had been wrongly removed from employment and wrongly deprived of his shares and (2) injunctive relief. Johnson brought counterclaims for declaratory relief, defamation, and conversion. He also requested indemnification for attorney fees and expenses under the indemnification provision in the subscription agreement.

In its order following a bench trial, the district court found that Mogren "lacked any credibility as a witness," that Johnson "lacked some credibility" but was "significantly more credible" than Mogren, and that Palidium's counsel "was extremely credible." The district court declined to enforce the settlement agreement because (1) Mogren was barred from enforcing the agreement under the doctrine of unclean hands; (2) the settlement agreement was voidable based on Mogren's misrepresentation of a material fact; and (3) the settlement agreement was rescinded. The district court therefore granted Johnson's request for declaratory relief limiting Mogren's ownership interest to 51,020.5 shares of Palidium common stock. The district court also denied Johnson's counterclaim for defamation, granted Johnson's counterclaim for conversion in the amount of $50,000, and denied Johnson's request for indemnification. The district court later denied Johnson's motion for reconsideration of the denial of indemnification.

Both parties appeal.

8

## D E C I S I O N

## I.

Mogren challenges the district court's grant of declaratory relief to Johnson. "When reviewing a declaratory judgment action, we apply the clearly erroneous standard to factual findings, and review the district court's determinations of law de novo." *Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 615 (Minn. 2007) (citations omitted). When, as here, a declaratory-judgment action is tried to the district court, "the court as the trier of facts must be sustained in its findings unless they are palpably and manifestly contrary to the evidence." *See Samuelson v. Farm Bureau Mut. Ins. Co.*, 446 N.W.2d 428, 430 (Minn. App. 1989), *review denied* (Minn. Nov. 22, 1989). "A finding is clearly erroneous if we are left with the definite and firm conviction that a mistake has been made." *In re Distrib. of Attorney's Fees between Stowman Law Firm, P.A., & Lori Peterson Law Firm*, 855 N.W.2d 760, 761 (Minn. App. 2014) (quotation omitted), *aff'd*, 870 N.W.2d 755 (Minn. 2015). We give "due regard . . . to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01.

The district court declined to enforce the settlement agreement between Mogren and Johnson because it concluded that (1) Mogren was barred from enforcing the agreement under the doctrine of unclean hands; (2) the settlement agreement was voidable based on Mogren's misrepresentation of a material fact; and (3) the settlement agreement was rescinded. We start our analysis by considering whether the parties rescinded the settlement agreement.

9

The party claiming rescission must prove by clear and convincing evidence that the parties intended to rescind. *Brunsoman v. Lexington-Silverwood*, 385 N.W.2d 823, 825 (Minn. App. 1986), *review denied* (Minn. June 13, 1986). "Mutual assent to rescind a contract may be inferred from the attendant circumstances and conduct of the parties." *Busch v. Model Corp.*, 708 N.W.2d 546, 551 (Minn. App. 2006). But "[c]onduct indicating abandonment must be positive, unequivocal, and inconsistent with the existence of the contract." *Brunsoman*, 385 N.W.2d at 826 (quotation omitted). Here, the district court concluded that Johnson had produced evidence at trial showing a mutual rescission of the settlement agreement on September 25, 2013 "beyond a reasonable doubt, a much higher standard of proof than the required clear and convincing standard."

Mogren first argues that there could be no mutual rescission because Palidium did not rescind the settlement agreement. Palidium, Johnson, and Mogren were all parties to the settlement agreement, with Johnson signing for both himself and Palidium. Mogren is correct that the district court's findings regarding rescission focused on the actions of Mogren and Johnson. But just as he could sign the settlement agreement on Palidium's behalf, Johnson could rescind the settlement agreement on Palidium's behalf. *See SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 866 (Minn. 2011) (stating that a corporation has imputed knowledge of the actions of its agent when the agent acts within the scope of his authority); *Walsh v. Selover, Bates & Co.*, 105 Minn. 282, 284-85, 117 N.W. 499, 500 (1908) (imputing an agent's oral modification of a written contract to the corporation).

Mogren also argues that there was no mutual rescission because the parties did not agree to a rescission in writing. The settlement agreement stated that it "shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or in part, except by written amendment signed by each of the [p]arties hereto." It is undisputed that the parties did not sign a written agreement to rescind the settlement agreement. But "a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides that it shall not be orally varied or rescinded." *Larson v. Hill's Heating & Refrigeration of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. App. 1987), *review denied* (Minn. Apr. 17, 1987). Contrary to Mogren's assertion, the language in the settlement agreement requiring a written agreement to rescind is not dispositive, and we must analyze whether the parties orally agreed to rescind the settlement agreement. *See id.*

Regarding rescission, the district court found that (1) Mogren first asked Palidium's counsel to revise the settlement agreement to ensure that Mogren's ex-wife could not claim Mogren's additional shares; (2) Mogren never responded to Palidium's counsel's proposed revisions; (3) Mogren told Johnson that he needed to rescind the settlement agreement; (4) both Mogren and Johnson visited Palidium's counsel and informed him "they wished to rescind" the settlement agreement; and (5) Palidium's counsel gave Mogren all files related to the settlement agreement and an original copy of the agreement at Mogren's request. We conclude that these findings are supported by the record, especially when due regard is given to the district court's opportunity to judge the witnesses' credibility. *See* Minn. R. Civ. P. 52.01. Johnson testified that Mogren

11

"call[ed] [him] in a panic" and that Mogren stated that the parties needed to "rescind [the settlement agreement] and rip it up." Johnson further testified that the parties visited Palidium's counsel together to "mutually rescind this agreement." Johnson believed that Mogren used the word "rescind" or "destroy." Similarly, Palidium's counsel testified that he understood that Mogren and Johnson "had agreed that the document would be torn up, which was a phrase that was used during that meeting, and that once the marital property settlement was completed, they would come back to [him] with new instructions." The record provides clear evidence of an oral agreement to rescind the settlement agreement.

But Mogren argues that the record reveals no mutual rescission because the parties' subsequent conduct is inconsistent with rescission. *See Brunsoman*, 385 N.W.2d at 826 ("Conduct indicating abandonment must be positive, unequivocal, and inconsistent with the existence of the contract." (quotation omitted)). As support, Mogren cites his continuing actions as Palidium's CEO following the alleged rescission of the settlement agreement. But the settlement agreement says nothing about Mogren's role as CEO. Mogren's employment as CEO was based on the voting agreement and his subsequent appointment by the board. There is no evidence that the parties rescinded the voting agreement and board action at the time of the settlement-agreement rescission. The parties' rescission of the settlement agreement was simply intended to prevent Mogren's ex-wife from claiming a marital share of the Palidium stock to be distributed to Mogren under the settlement agreement. Mogren's continued appointment as CEO is not conduct inconsistent with rescission of the settlement agreement.

12

Mogren also cites the memorandum of understanding as evidence that the parties did not rescind the settlement agreement. The memorandum of understanding states that Mogren transferred his stock to Johnson "for a time period to expire on" December 1, 2013, after which the stock would revert to Mogren. Mogren argues that he could only have had that stock to transfer if the settlement agreement had remained in effect. In addition, Mogren argues that the statement in the memorandum of understanding that "all previous agreements remain in full effect, and this [a]greement is supplemental thereto" means that the settlement agreement remained in effect. We disagree. The district court found that Mogren drafted the memorandum, that Mogren lacked credibility, and that Mogren falsely represented to Johnson that the purpose of the memorandum was to hold half of Johnson's stock in reserve for later purchase by Mogren. Mogren stated at oral argument that he does not challenge the district court's findings of fact or credibility determinations. In addition, the memorandum does not specifically refer to the settlement agreement and, in fact, discusses a different amount of shares from the amount discussed in the settlement agreement. Finally, Mogren cites no caselaw that suggests that language in a later agreement that "all previous agreements remain in full effect" overcomes evidence of an earlier mutual rescission of the previous agreement in question.

We conclude that the district court's findings of fact regarding the parties' rescission of the settlement agreement are supported by the evidence and therefore not clearly erroneous. *See Onvoy*, 736 N.W.2d at 615; *Samuelson*, 446 N.W.2d at 430. The district court did not err by declining to enforce the settlement agreement on this ground

13

and granting declaratory relief to Johnson. Because we affirm the grant of declaratory relief based on the parties' mutual rescission of the settlement agreement, we need not consider the district court's alternative reasons for granting relief to Johnson.

## II.

Mogren also challenges the district court's determination that he converted $50,000 collected from the sale of Johnson's shares to the third party. "Conversion occurs where one willfully interferes with the personal property of another without lawful justification, depriving the lawful possessor of use and possession." *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. App. 2003) (quotation omitted). To rule in favor of Johnson on his conversion counterclaim, the district court was required to find that Johnson had a property interest and that Mogren deprived Johnson of that interest. *See id.* "Wrongfully refusing to deliver property on demand by the owner constitutes conversion." *Id.* (quotation omitted).

The parties agree that a third party agreed to purchase $50,000 of stock from Johnson. Johnson testified that he told Mogren before receiving the money that he would "bring it back" if Palidium needed funds for an upcoming shoe purchase. He then testified that Mogren asked him to return the money and that he returned it. Further, Johnson testified that he never received an explanation regarding where the money went and that he never received the money back. The district court relied on Johnson's testimony when concluding that Mogren committed conversion, and disregarded Mogren's not credible testimony that he never received money from the transaction. We defer to the district court's credibility determinations. *See* Minn. R. Civ. P. 52.01.

14

Mogren argues that this record does not support the district court's conversion determination because there is no evidence that Johnson instructed Mogren to deposit the money into Palidium's account and there is no evidence that Johnson demanded the money back from Mogren. But conversion does not require Mogren to disregard Johnson's instructions regarding the money, only to deprive Johnson of his property interest. *See Williamson*, 661 N.W.2d at 649. And although refusing to return property upon demand constitutes conversion, *id.*, demand and refusal need not be proved when there is other evidence of conversion, *Brandenburg v. Nw. Jobbers Credit Bureau*, 128 Minn. 411, 414, 151 N.W. 134, 135 (1915). We conclude that the record supports the district court's conclusion that Johnson had a property interest in the $50,000 and that Mogren deprived Johnson of that property interest. *See Williamson*, 661 N.W.2d at 649.

In his reply brief, Mogren argues that the record provides no evidence of his intent to commit conversion. Mogren has forfeited this issue by not raising it in his principal brief. *See Wood v. Diamonds Sports Bar & Grill, Inc.*, 654 N.W.2d 704, 707 (Minn. App. 2002) ("If an argument is raised in a reply brief but not raised in an appellant's main brief, and it exceeds the scope of the respondent's brief, it is not properly before this court and may be stricken from the reply brief."), *review denied* (Minn. Feb. 26, 2003). Nevertheless, we conclude that the record is sufficient to show that Mogren knew his action deprived Johnson of his property interest. *See Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 586 (Minn. 2003) (stating that the actor must know his act is "destructive of any outstanding possessory right" (quotation omitted)); *Williamson*, 661

15

N.W.2d at 649 (defining conversion as "willfully interfer[ing] with the personal property of another without lawful justification" (quotation omitted)).

Finally, Mogren argues that he, at most, only converted $36,000 because Johnson testified that Mogren changed the deal so that Mogren collected $14,000 and Johnson collected $36,000. But the record shows that the third party agreed to purchase $50,000 of Johnson's personal stock and that the third party in fact paid $50,000. We conclude that the district court did not err by determining that Mogren converted $50,000 from Johnson.

**III.**

Johnson challenges the district court's denial of his request for indemnification. The 2010 subscription agreement between Mogren and Palidium, which was signed by Johnson on Palidium's behalf, included an indemnification provision. Mogren agreed

> to indemnify and hold the Company and its governors, managers, affiliates, agents and employees harmless from and against any and all loss, claim, damage, liability or expense, and any action in respect thereof, arising out of a breach of any such representation, warranty or covenant, together with all reasonable costs and expenses (including attorneys' fees) incurred by the Company or any such person in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters so indemnified against.

We analyze a contract to determine the intent of the parties and enforce clear and unambiguous contract language. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010). "Absent ambiguity, the interpretation of a contract is a question of law."

16

*Roemhildt v. Kristall Dev., Inc.*, 798 N.W.2d 371, 373 (Minn. App. 2011), *review denied* (Minn. July 19, 2011).

The district court determined that the subscription agreement remained in effect but that Johnson was not entitled to indemnification because (1) Mogren did not breach a representation, warranty, or covenant under the agreement that would entitle Johnson or Palidium to indemnification and (2) Johnson was not a party to the subscription agreement. We begin by analyzing whether a breach entitles Johnson to indemnification.

Johnson identifies two alleged breaches of the subscription agreement that entitle him to indemnification. First, Mogren affirmed in the agreement that he had no right to employment with Palidium "by virtue of [his] ownership of securities" and that any change in Mogren's employment relationship with Palidium would be "set forth in a written agreement." Second, Mogren agreed to disclose any intellectual property to Palidium and to assign his interest in any intellectual property to Palidium.

Johnson argues that Mogren breached these provisions by bringing employment and intellectual-property claims in this lawsuit. The district court disagreed, explaining that this lawsuit involves the settlement agreement, not the subscription agreement. We agree. Mogren requests declaratory and injunctive relief that he has been wrongly removed from employment and wrongly deprived of his shares. Mogren's claims are not premised on his "ownership of securities" under the subscription agreement, but on his alleged rights under the settlement agreement. Mogren does not claim that his stock ownership under the subscription agreement gives him a right to employment or to Palidium's intellectual property. Mogren's alleged employment rights arise from the

17

voting agreement and board action, not the settlement agreement, much less the subscription agreement. And Johnson presents no evidence that Mogren failed to disclose or assign his interest in Palidium's intellectual property. The indemnity clause addresses actions "arising out of a breach of any . . . representation, warranty or covenant" in the subscription agreement. This lawsuit has nothing to do with Mogren's rights under the subscription agreement, does not "arise[] out of a breach" of any representation or warranty in the subscription agreement, and does not establish a breach of that agreement.

The district court did not err by denying indemnification because no breach entitles Johnson or Palidium to invoke the indemnification provision. We therefore affirm the district court's denial of indemnification on this basis and need not address whether Johnson was a party to the subscription agreement.

**Affirmed.**

18